**RHODE ISLAND COMMITTEE ON ENERGY et al.**

v.

**GENERAL SERVICES ADMINISTRA-TION, et al.**

Civ. A. No. 74–272.

United States District Court, D. Rhode Island.

July 8, 1975.

Myron M. Cherry, Chicago, Ill., Thomas C. Mullaney, Jr., Providence, R. I., for plaintiffs.

Lincoln C. Almond, U. S. Atty., R. I., Everett C. Sammartino, Asst. U. S. Atty., R. I., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

Plaintiffs[1] bring this action against the United States, the General Services Administration ("GSA"), and Arthur F. Sampson, the Administrator of GSA (sometimes hereinafter collectively referred to as "GSA"), for declaratory and injunctive relief. Plaintiffs contend that GSA, as the federal agency empowered to dispose of "surplus" government property, proposes to dispose of a parcel of land located in Charlestown, Rhode Island and now owned by the Department of the Navy as the Charlestown Naval Auxiliary Landing Field ("NALF"), in violation of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* ("NEPA"), and the Federal Property and Administra-

---

1. Plaintiffs are four named individuals and one unincorporated association ("RICE") which is comprised of individual members, including the named plaintiffs, and the following organizations: Rhode Islanders for Safe Power, American Littoral Society, New England Coalition on Nuclear Pollution, and Ecology Action of Rhode Island. *See* discussion *infra* at 52.

tive Services Act of 1949, 40 U.S.C. § 471 *et seq.* ("FPAS"), as amended, as well as regulations promulgated under both acts.

## PROCEEDINGS IN DISTRICT COURT

On December 4, 1974, plaintiffs filed their verified complaint, a lengthy document which, if read broadly, accused GSA of conspiring with the Narragansett Electric Company ("Narragansett") and its parent, the New England Power Company, to circumvent the mandates of FPAS and NEPA in the disposal of the NALF. Plaintiffs' motion for a temporary restraining order was heard in open court on December 4, at which time the Court entered an order halting the disposal to Narragansett. With the parties' consent, the matter was set down for a consolidated hearing on the merits on December 11, 1974. Although invited to do so, Narragansett did not seek to intervene.

Plaintiffs' case at the December 11 trial consisted of three witnesses, two of these being named plaintiffs whose testimony was offered primarily to establish standing, and ninety-seven documents,[2] the vast majority of which were obtained from the files of GSA itself pursuant to a request made by plaintiff Claudine Schneider under the Freedom of Information Act, 5 U.S.C. § 551 *et seq.*, prior to the filing of this action. Aside from exhibits 1–3, which are copies of this Court's orders, the remainder of plaintiffs' exhibits are documents which had been produced by the defendants prior to trial.

After their motion for a directed verdict was denied,[3] the defendants declined to offer any evidence, documentary or oral, at trial. They did file the affidavit of Robert R. Rice, an assistant general counsel of GSA, dated December 23, 1974, along with their first post-trial memorandum. *See* note 22 *infra.*

## FINDINGS OF FACT [4]

On November 9, 1973, the Department of the Navy informed GSA that 2,595.1 acres of land denominated the "U. S. Naval Air Station, Quonset Point, Rhode Island," were "excess" to the Navy's needs and thereby available to other federal agencies (Exh. 4). *See* 40 U.S.C. § 472(e). The property was screened by federal agencies in November, 1973, but no federal interest was indicated at that time (Exh. 15). The NALF was included in this acreage, although not specifically mentioned and geographically sepa-

---

2. Two additional documents, exhibits 98 and 99, whose admissibility was stipulated to by the parties, were introduced at a later date without further court hearing. Due to an understandable clerical error given the bulk of documents, there is no exhibit numbered "10."

3. Defendant's motion was grounded on plaintiffs' alleged lack of standing to maintain the action. The motion was denied on the basis of plaintiffs' standing under NEPA. *See* discussion *infra* at 52–53. The question of plaintiffs' standing under FPAS was reversed and is discussed *infra* at 53–54.

4. The bulk of the documents introduced into evidence comprises the administrative record which GSA had before it in making its decisions concerning disposal of the NALF. The defendants have not disputed the accuracy or thoroughness of the administrative record as presented to the Court. Although some documents make reference to others not includ-

ed in the record, the defendants have not challenged these omissions as material.

In view of the lack of live testimony to explain the exhibits, identify their source, or place them in precise context, the Court as trier of fact has been forced to draw a great many inferences, tested on a "reasonableness" standard, in order to develop the following factual picture. Although not all of the symbols employed to designate GSA departments are readily decipherable, it is clear that a prefix of the numeral "1" identifies Region One of GSA, with its offices located in Boston, while the same initials without a prefix indicate the central office of the same department, located in Washington. Thus "1PK" indicates the Boston office of the Real Property Division of the Public Buildings Service; "P" indicates the Public Buildings Service generally; "PZ" signifies the Appraisal Staff; "L" indicates GSA's legal department; and "A" denominates the Administrator.

rated from Quonset Point.[5] This lack of specificity resulted in the failure of one federal agency to express its interest in acquiring a portion of the NALF during the federal agency screening period and before it was declared "surplus," and thereby made available to nonfederal agencies, on May 1, 1974.[6] *See* 40 U.S. C. § 472(g).

On May 1, 1974, GSA issued a notice that the NALF had been determined "surplus" and available for disposal under provisions of the FPAS (Exh. 5). Nonfederal public agencies interested in acquiring the property were directed to file a notice of intent by May 10, 1974. Various federal agencies were advised in advance (Exh. 18–

5. Exh. 15. Virtually all other documents in the record refer to the NALF as a separate entity in Charlestown, Rhode Island, as distinguished from the Naval Air Station at Quonset Point, Rhode Island. In declaring the NALF "surplus," GSA assigned to it a number ("N–RI–469B") separate from the other acreage abandoned by the Navy. (*E. g.*, Exh. 28, 33A).

6. The May 23, 1974, letter of Willard M. Spaulding, Jr., Acting Regional Director of the Bureau of Sport Fisheries and Wildlife, Fish and Wildlife Service of the Department of the Interior, to Joseph W. O'Connell, the local GSA official primarily in charge of the NALF disposition, is self-explanatory. It appears in the record as Exhibit 33 and is quoted in full:

"Mr. J. W. O'Connell
Director
Real Property Division
General Services Administration
John W. McCormack Post Office and Courthouse
Boston, MA. 02109.
Dear Mr. O'Connell:
The Department of the Interior, Bureau of Sport Fisheries and Wildlife, has made a study concerning the lands described in the notice of surplus determination covering 603.77 acres of fee land and 1.33 acres of easements, with improvements, at the Navy Auxiliary [*sic*] Landing Field, Charlestown, Rhode Island.
An area of approximately 367 acres, as shown on the attached map, has been determined to have exceptionally high value for migratory waterfowl as well as shellfish and other wildlife. The area has had a long history of waterfowl usage and has particular value for canvasbacks, redheads, and black ducks. The southerly portion of the 367 acres contains nearly 2 miles of shoreline on Ninigret Pond as well as wetlands along the shore. The subject lands are across Ninigret Pond from the 27.5 acres previously transferred to the Bureau for National Wildlife Refuge purposes.
Included in the 367 acres are lands considered essential as waterfowl nesting cover and buffer to protect the nesting. The 367 acres would be managed in its natural state

for the benefit of waterfowl and administered as part of the National Wildlife Refuge System. However, public usage will be permitted during the months of the year when such usage will not be detrimental to the migratory bird program.
Under Part 205.10.3A(3) of the Department of the Interior Departmental Manual, 'The head of each Bureau or office may obtain from other Federal agencies excess real property and related personal property, in accordance with 40 U.S.C. 433(c)(3), and appropriate regulations of the General Services Administration'. Under part 4AM 4.-5D(1) of the Bureau of Sport Fisheries and Wildlife Administrative Manual, 'Regional Directors and deputy regional directors may severally exercise the authority of the Director to enter into contracts for the lease and/or acquisition of lands or interests in lands whenever such lands or interests in lands are to be acquired for administration through the Bureau pursuant to any Act of Congress'.
It is requested that custody, control, and accountability of the 367 acres be transferred to the Bureau of Sport Fisheries and Wildlife of this Department pursuant to the provisions of Public Law 537, 80th Congress, (62 Stat. 240, 26 U.S.C. 667b [16 U.S.C.A. § 667b]).
In the event a survey is needed to delineate the boundary for transfer purposes, the Bureau offers its services.
There is a potential need for a building such as No. 152 or No. 153 which might be moved to the 367-acre parcel. The possible use of this building is mentioned in the event it might fit in with plans for disposal of the remainder and should be considered separate from our request for transfer of the 367 acres.
This late request is due to the fact that the notice of excess referred to 2,595.1 acres at Quonset Point and did not mention the Navy Auxiliary [*sic*] Landing Field at Charlestown. Had it clearly stated that the Charlestown lands were included in the 2,595.1 acres, we would have indicated an interest immediately.

Sincerely yours,
s/ Willard M. Spaulding, Jr.
Acting Regional Director"

20) that the "Notice of Surplus Determination" was being sent to the State of Rhode Island (Exh. 21, 23), the Town of Charlestown (Exh. 22, 25), and others upon request (Exh. 32, 93). Prior to that time, GSA had already received expressions of concern as to the ultimate disposition of the property from Ecology Action for Rhode Island (Exh. 6–9, 11), from Concerned Citizens of Rhode Island regarding the possible construction of a nuclear power plant, and an expression of interest in acquiring the property from the Town of Charlestown (Exh. 15, 26). Additionally, the State of Rhode Island had requested that the Navy issue a license to erect a meteorological tower on the NALF to gather data to evaluate the feasibility of using the site for an electricity generating plant (Exh. 36).

As part of its standard disposal procedures, GSA had already requested an appraisal to determine the fair market value of the property.[7] *See* 40 U.S.C. § 484(e)(3). The appraiser's report was approved on October 8, 1974 and supplemented on October 23. *See* note 7 *supra*. On May 1, GSA also sought to determine "whether or not the subject property has any historical significance"

and invited Frederick C. Williamson, Director of the Rhode Island Department of Community Affairs and State Historic Preservation Officer, to make the necessary studies. (Exh. 24). In a responding letter dated May 8, 1974, Mr. Williamson stated that the Rhode Island Historical Preservation Commission was conducting a survey of the NALF under a grant from the New England Power Company and hoped to complete the task by late summer. (Exh. 33A). In a letter to GSA of September 24, 1974, Mr. Williamson reported some of the results of the Commission's surveys and advised:

> "Subsequent research by the Commission's new staff archeologist has revealed that a major Indian site exists on the former Charlestown Naval Air Station, near Foster's Cove in the western section of the base. A National Register nomination for this site is in process. Further information on this and other archeological sites will be made available in the following weeks." (Exh. 99).

Details of the discovery and other results of the Commission's survey are contained in a draft report of November, 1974.[8] (Exh. 97).

---

7. GSA's request, dated April 19, 1974, asks that the determination of the fair market value of the NALF be "[b]ased upon the highest and best use for which there is a current market." (Exh. 16). Part III of the appraisal made by J. W. Riker Real Estate, which was approved by GSA on October 8, 1974, concluded that the "highest and best use of the property is for residential development with the existing improvements demolished." (Exh. 96, p. 2). The appraisal itself bears no date, but appears to have been submitted to GSA sometime prior to August 5, 1974. (Exh. 70, p. 2).
On October 18, 1974, an inter-departmental memorandum sought a reappraisal of the NALF which would "consider the special-use value of this site on the assumption that the property is immediately available for acquisition and has at this time all approvals needed for the construction of a nuclear electric generating plant." (Exh. 94). As a result, on October 23, 1974, J. W. Riker Real Estate submitted an additional report taking into account these instructions and a sale

price of $6,000.00 per acre. The report concluded that the contemplated sale price of $6,000 per acre represented twice the amount that could be obtained on the open market and the highest price per acre paid to date to acquire a nuclear power plant site in New England. (Exh. 95).

8. The draft report (Exhibit 97) entitled "An Historic, Architectural & Archeological Investigation of the Former Charlestown Naval Air Station and Vicinity," was admitted into evidence over defendants' objection, not for the truth of the findings made therein, but as relevant to a determination of the quantity and quality of environmental data available to GSA at the time of its disposal action in assessing GSA's argument that it is too early to prepare a meaningful environmental impact statement in compliance with NEPA. *See* discussion *infra*. Some of the "Findings" made in this lengthy document include the following:
"The Charlestown Auxiliary Naval Station is situated in a rural and once largely

After May 1, formal notices of intent to acquire the NALF were received by GSA from a number of public and private entities. The State advised that it sought the NALF for "multi-purpose use" (Exh. 28); the Town renewed its earlier requests (Exh. 27, 62); Providence College and the Narragansett Tribe of Indians each indicated their interest in acquiring the land through the Department of Health, Education, and Welfare (Exh. 31, 34, 35, 65, 66); and the Bureau of Sport Fisheries and Wildlife of the Fish and Wildlife Service, Department of the Interior ("FWS"), sought over 300 acres of the NALF to be used as a refuge for migratory waterfowl. *See* note 6 *supra.*

In a letter dated May 6, 1974, the President of Narragansett Electric Company wrote directly to Administrator Sampson [9] to formally request that GSA enter negotiations for the sale of the NALF to Narragansett for construction of a nuclear power plant on the site. Although not a public agency, Narragansett stated its belief that GSA had authority to negotiate a disposal to it under the FPAS, 40 U.S.C. § 484 (e)(3)(G), based upon two unusual circumstances: first, the NALF was "uniquely suited to nuclear power plant use"; and second, the "Arab oil embargo" and resulting intensification of the "energy crisis" had hit New England particularly hard and caused then President Nixon to issue a directive on April 19, 1974, that federal surplus property should be made available, whenever practicable, for energy facilities. (Exh. 86).[10]

agricultural region where land use patterns dating from the colonial era continue to predominate. Here a rolling, pond-dotted interior meets an open, expansive coastal plain. The special character of the area is strongly influenced by the presence of some seventy historic buildings, sites, and districts, including a concentration of well-known Indian sites, and also three noteworthy archeological sites on the Air Station proper discovered during the course of this study.

Preliminary planning for the proposed nuclear power plant at the former Air Station indicates a structure with minimum dimensions of 310 feet long, 95 feet wide, and 122 feet high with two, 200 foot high containment structures attached; twelve stories tall, containing approximately eight acres of floor space, flanked by two twenty story buildings and, possibly, accented by a forty story tower—the whole illuminated at night. From the complex, transmission lines would extend across western Rhode Island.

It is obvious that the proposed structure's mass, in juxtaposition to existing architecture, will represent a scale at odds with the rural-agrarian, resort-residential development pattern typical of the region, thus introducing a discordant use and physical feature into the overall historic character of the area.

Because of the delicate balance between land use, density of development, and the quiet, yet dominant presence of historic buildings and sites in the region, it is the finding of this study that construction of a nuclear power plant at the Charlestown site will have a generalized negative effect on the historic environment of this area and a direct negative visual effect on a significant number of specific sites. This finding must be carefully weighed with other considerations outside the scope of this study."

9. The NALF disposal process was headed by Joseph W. O'Connell, Director, Real Property Division, Public Buildings Service, at the local level, and by Walter C. Moreland, Assistant Commissioner of the Office of Real Property, Public Buildings Service, at the national level.

10. Narragansett's letter contains the following statements:

"We [Narragansett Electric Company] have a keen interest in the disposition of the land in Charlestown, Rhode Island, formerly used as a naval air station, which was declared surplus by the General Services Administration in late April 1974. For nearly a year, we have been investigating possible location of a nuclear power plant on the site. Our studies indicate that this property would be a prime location for the siting of a nuclear power plant. Nuclear sites are already extremely scarce in New England. Therefore, it would be desirable, even under ordinary circumstances to devote the Charlestown property to use as a nuclear facility site. The dramatic recent developments in the energy field, with which we are all familiar, commencing even before the Arab Oil

As the May 6 letter indicated, Narragansett's interest in the NALF was the result of nearly a year's investigation. *See* note 10 *supra*. By May 8, its parent, the New England Power Company, had already funded a study to determine the historical and archaeological significance of the area and the potential environmental impact of a nuclear power plant on the region. (Exh. 33A). Even before Narragansett formally expressed interest in the NALF, the State of Rhode Island's request for a license to erect a meteorological tower as noted above was made on Narragansett's behalf. (Exh. 38, 70). The license was issued by the Navy on May 23 with GSA concurrence. (Exh. 38–39).

From the moment Narragansett made its request on May 6, the proposed negotiated sale received top priority in GSA's Washington Office of Real Property. A memorandum of May 8 indicates that Walter Moreland, Assistant Commissioner of the Office of Real Property, and Minton Holland, GSA's general counsel, had already reviewed Narragansett's letter and concluded that direct negotiations could be undertaken. (Exh. 87). Although purporting to consider all interests equally,[11] preferred parties were quickly sorted out, and

GSA's energies were devoted to bring them to an agreement. These parties were the State, the Town, and Narragansett, the State and Town being willing to defer their respective interests in acquiring the NALF only if Narragansett could acquire the same to construct a nuclear power plant.[12] According to a GSA "Fact Sheet" prepared August 5, 1974 (Exh. 70), Assistant Commissioner Moreland and a Mr. Berky met with representatives of Narragansett on May 7 to discuss sale of the NALF for a nuclear power plant. The license for the meteorological tower was approved and executed by May 23. (Exh. 39, 70). The report also makes clear that by the beginning of July GSA had determined in principle the ultimate disposition of the NALF:

"On Wednesday, July 3, 1974, GSA officials met with representatives of the State of Rhode Island and the Electric Company in Central Office to discuss alternative ways of selling the property for use as a nuclear power plant and the legal ramifications of such a transaction. At that meeting it was agreed that while the property was being appraised the lawyers would start drafting a ·sale agreement obligating the Government to sell the

embargo, and evidenced by rapid, unavoidable increases in the cost of electricity to consumers in the New England region, make it clear, that the circumstances today are extraordinary. It is not merely desirable, but almost imperative, that this property be made available for development of a nuclear generating facility.

One of this nation's most urgent goals is the achievement of energy self-sufficiency as promptly as possible. As a step toward reaching that goal, on April 19 a Presidential memorandum was issued to you and heads of other Executive Departments and Agencies, designed to assure that to the greatest extent practicable, federal surplus real property would be made available for energy facilities, including power plants. We ask that you implement the Presidential directive in this instance.

It is difficult to imagine a more apt application of subsection 484(e)(3)(G) than the Charlestown property, for the follow-

ing reasons. The availability of deep water, the lack of development in the area, and the single ownership make the property uniquely suited to nuclear power plant use. The disproportionately burdensome impact of the energy crisis upon New England is clearly an unusual circumstance. The President's memorandum confirms the exceptional degree of our energy problems." (Exh. 86).

In keeping with President Nixon's directive, GSA amended its regulations on June 18, 1974, to provide that:

"Appropriate steps will be taken to ensure that energy site needs are considered along with other competing needs in the disposal of surplus real property." C.F.R. 101–47.204–1.

11. *See* note 14 *infra*.

12. *See, e. g.*, Exh. 46, 48, 51–54, 57, 70 p. 2, 73a p. 2, 81 p. 4.

property to the Power Company at a set price, possession to be delayed pending licensing of the nuclear power facility, the company to pay interest on the purchase price to the Government pending conveyance and the property to be conveyed to the State at the agreed upon price plus the interest paid by the Power Company if not used as the site for the nuclear power station. The sale agreement would prohibit any use of the property before conveyance except for exploratory studies and testing.

\* \* .\* \* \* \*

Although State representatives at the July 3 meeting thought that the proposed sale agreement would be acceptable to Town of Charlestown officials, it now appears that the Town might want to be the alternate recipient in lieu of the State. This has delayed final preparation of the sale agreement. We are now trying to clarify the matter." (Exh. 70, pp. 2–3).

Statements contained in last paragraph of the August 5 "Fact Sheet" prove very damaging to the defendants when the entire record is reviewed.

This report concludes that, as of August 5:

"There are also additional expressions of interest in the property from the Narragansett Indian Tribe and Providence College through the Department of Health, Education, and Welfare and from the Bureau of Sport Fisheries and Wildlife for transfer of 367 acres for wildlife conservation purposes. *Present planning contemplates that these interests will be rejected in favor of use of the property as a nuclear power plant site.*" (Exh. 70, p. 3) (emphasis added).

From the time of the Fish and Wildlife Service's request for approximately one half of the NALF on May 23 (*see* note 6, *supra*) until August 5, the record is completely devoid of any activity by GSA beyond a mere acknowledgement that FWS was interested in the property.[13] Despite the above-quoted language, GSA continued to reassure interested members of the public and Congress that the FWS interest was being seriously considered in late August and September. (Exh. 46, 48, 51–54).[14]

13. The Fish and Wildlife Service request of May 23, 1974, was not formally answered by GSA until November 12, 1974, when it was rejected in favor of Narragansett. (Exh. 89).

14. GSA responses to public inquiry regarding the disposition of the NALF are very disturbing when juxtaposed with its private negotiations with Narragansett. GSA public statements of its intent to give full consideration to the environmental impact and all competing interests are misleading in ascribing to GSA a more searching decision making process than that which the internal GSA documents reveal. (*See, e. g.,* Exh. 40, 42, 46–48, 51–54, 60). GSA statements such as "We have not formulated any *final* plans for the disposal of this property" (emphasis added) made on October 21, 1974 (Exh. 60), and "the DoI [Department of Interior, Fish and Wildlife Service] interest will be given additional consideration before any *sale* of the property for use as an electric generating station is *concluded*" (emphasis added), Exh. 46 (letter to Congressman Tiernan dated August 16, 1974), 48 (letter to Senator Pell dated August 16, 1974), 51–

54 (letters to various plaintiffs, *et al.*, of dates between August 22 and September 19, 1974) are, at best, prime examples of bureaucratic doubletalk. The most benign interpretation this Court can give to such statements is that they rely on an undisclosed, technical definition of "final" or "concluded" (*i. e.,* not occurring until the moment at which a sales contract is formally executed or final title is passed) to give the public the misimpression that all interests were being given equal consideration and that GSA had not yet committed itself to any disposal plan.

These letters to the public (Exh. 46, 48, 51–54) reveal that GSA similarly employed a highly technical, undisclosed set of definitions in making the statement "We cannot commence negotiations until the [real estate] appraisal has been approved." There can be no doubt that meaningful negotiations with Narragansett, the State and Town were commenced as early as July, 1974, when "it was agreed that while the property was being appraised the lawyers would start drafting a sale agreement obligating the Government to sell the property to the Power Company at a set price, possession to be

Similarly, no action had been taken with reference to the expression of interest of the Narragansett Indian tribe, nor that of Providence College. Indeed, nowhere in the record does it appear that GSA ever seriously analyzed the feasibility or desirability of *any* proposal for the NALF other than as a site for a nuclear power plant.

Furthermore, nowhere in the record does it appear that GSA ever seriously analyzed the feasibility or desirability of Narragansett's proposal to use the NALF to construct a nuclear power plant. The record instead reveals that GSA relied solely upon information supplied by Narragansett. As early as May 8, an intra-agency memorandum advised that:

"[W]e should obtain info from the Company [Narragansett] re peculiar characteristics of this property that makes [*sic*] it so suitable for the proposed use." (Exh. 87).

Such a statement was submitted to Assistant Commissioner Moreland by Narragansett in August. (Exh. 84, 85).[15] GSA does not appear to have made any effort to check the accuracy or strength of Narragansett's arguments. Nonetheless, these same arguments formed the basic justifications for the proposed negotiated sale in GSA's "Explanatory Statement" to Congress required by the FPAS, 40 U.S.C. § 484(e)(6). (Exh. 81, 84–86).

As far as the Town and State were concerned, GSA's only interest was in getting them to decide, between themselves, which one would receive the portion (50–55 acres) of the NALF that Narragansett would not require to construct a nuclear power plant and, in the event a nuclear power plant proved unfeasible, which one would be designated to acquire the NALF instead of Narragansett. It mattered not to GSA which interest prevailed, only that an accord be reached. (Exh. 70, 88, 91, 92). GSA made no effort to evaluate the merits of the State's as against the Town's proposed use of the land. At one point in August, GSA even delegated the task of bringing the State and Town to an accord to Narragansett. (Exch. 88).

By the end of August, virtually all plans for the disposition to Narragansett had been worked out in rough. A draft sales agreement had been prepared by GSA's legal staff. (Exh. 91, 92). At a meeting with representatives of the Federal Energy Administration ("FEA"), the Fish and Wildlife Service ("FWS"), and the Atomic Energy Commission ("AEC"), on August 22, GSA informed FWS that its request would be denied in preference to Narragansett, although some accommodation might later be arranged. FWS's concern about the power plant's effect on ecology was met with the response that it would be able to comment on the issue when a draft environmental impact statement ("DEIS") was prepared pursuant to NEPA. As to NEPA, the AEC representative advised that GSA should report a "negative EIS", that is, that GSA's disposal action to Narragansett did not constitute "a major federal action significantly affecting the quality of the human environment" within the meaning of § 102(2)(C) of the Act, 42 U.S.C. § 4332(2)(C), presumably because it was a conditional sale, and that prior to any sale the AEC would ulti-

delayed pending licensing of the nuclear power facility . . ." (Exh. 70, p. 2). On August 15, 1974, Assistant Commissioner Moreland again directed the Boston office to draft a sales contract by Labor Day although aware of the fact that the appraisal had not yet been approved. (Exh. 91). The agreed-upon purchase price of $6,000 per acre was necessarily reached before formal approval to "negotiate" was given on October 23 by Assistant Commissioner Moreland (Exh. 80), the date the final appraisal of the property was submitted. *See* note 7 *supra*.

15. The draft (Exh. 84) and final (Exh. 85) statements submitted by Narragansett through the New England Power Service Company (an affiliate) in August merely expand upon the reasons originally cited in its letter of May 6. (Exh. 86). *See* note 10 *supra*.

mately be required to prepare a full environmental impact statement ("EIS") in connection with Narragansett's application for authorization to construct the power plant. (*See* Exh. 79). The projected date for such an application was listed as "June" (of necessity, of the year 1975 or thereafter), and the date for the first DEIS was projected for the following August or September. (Exh. 88).

Thus, by the end of August, all that remained was to iron out final details and terms of the sale and to await resolution of the State-Town conflict. (Exh. 73). An end-of-October completion date was set and kept. (Exh. 73a, 74). During October, GSA prepared final statements and authorizations in order to comply with NEPA and FPAS. As to NEPA, a two-page document, prepared by the Boston office of GSA and submitted to GSA–Washington on October 17 (Exh. 79), formed the basis for GSA's formal declaration of October 30 that the proposed disposal to Narragansett did not require the preparation of an EIS. (Exh. 83). This document, entitled "Determination Under PMD 1095.-1A," described the NALF property and environs, the proposed disposal to Narragansett, and the conclusion that no EIS was necessary. This conclusion was based in part on the statement that:

"Since the Atomic Energy Commission, or a successor agency, will be primarily responsible for licensing the proposed plant, AEC is considered the lead agency in obtaining environmental clearance of the project. GSA will not convey title to the Narragansett

Electric Company until there has been full compliance by AEC with the requirements of the National Environmental Policy Act of 1969." (Exh. 79).

The document also contains the following statement:

"There is no known historical significance attributable to this property."

This last statement is particularly disturbing in view of the fact that the Regional Office had been advised by Mr. Williamson's letter of September 24, 1974, that at least one major archaeological site had already been identified at the NALF. GSA does not appear to have questioned the accuracy of that earlier report, and indeed had originally requested it. *See also* note 8 *supra.* The document similarly omitted any reference to the FWS request for the NALF or the reasons therefor. *See* note 6 *supra.*

As to the FPAS, formal authorization to negotiate a sale to Narragansett and the Town of Charlestown was given by Assistant Commissioner Moreland on October 23. (Exh. 80). The following day, the Regional Office forwarded to GSA–Washington the "Explanatory Statement" to be submitted to the Congressional subcommittees. (Exh. 81). 40 U.S.C. § 484(e)(6). Narragansett's formal offer to purchase the NALF and an earnest money deposit were received by GSA on October 30 (Exh. 76, 78),[16] and notice of the proposed sale and the "Explanatory Statement" were sent to Congress. (Exh. 82). Like the earlier document prepared to comply with

---

16. The "Offer to Purchase" (Exh. 76) set out in full the proposed contractual obligations of the parties and included the following items: 1) the sale price was set at $6,000 per acre; 2) final conveyance to Narragansett was conditioned upon its use as a site for a nuclear power station, and Narragansett was obligated to obtain the necessary construction and environmental clearances; 3) Narragansett was given until May 1, 1982 (*i. e.*, approximately 7½ years) to obtain the various construction permits and clearances, with provision for a

two-year extension to obtain appellate review, with title to pass thirty days after all clearances were obtained. If unsuccessful within the timetable, the agreement would automatically terminate; 4) during the interim period between acceptance of the Offer and one of the events described in (3) above, Narragansett would have exclusive possession of the NALF, although restricted to the performance of studies, tests, etc., required to obtain the necessary clearances to construct a nuclear power plant. (*Cf.* Exh. 74, 77).

NEPA (Exh. 79, 83), the "Explanatory Statement" failed to indicate that agencies other than the State and Town, most notably the FWS, had expressed an interest in acquiring the NALF and had not agreed to yield to Narragansett's interest. By letter of November 21, 1974, the House of Representatives Subcommittee on Government Activities, through its chairman, Representative Jack Brooks, formally stated its opposition to the proposed sale.[17] (Exh. 98). On December 4, plaintiffs instituted this action.

## CONCLUSIONS OF LAW

### Standing and Jurisdiction

In essence, plaintiffs challenge two final actions of GSA: one, under NEPA, its report of a "negative EIS" and, two, under FPAS, its decision to dispose of the NALF by negotiated sale to Narragansett Electric Company. At the hearing on the merits held in this matter on December 11, 1974, this Court ruled that plaintiffs had standing to sue under NEPA, but reserved decision as to their standing under FPAS.

### NEPA

■ As to plaintiffs' standing under NEPA, the Court found that the individual plaintiffs, as owners of land near and/or abutting the NALF and recreational users of the pond and proximate environs of the NALF, have direct economic and aesthetic interests which will be substantially injured if the NALF is disposed in a manner which adversely affects the environment. Plaintiffs further claim that the proposed disposal will threaten the unique ecological and historical nature of the area. Plaintiff Glenn testified that the feasibility testing commenced by Narragansett prior to the issuance of the restraining order had already impaired the environment by upsetting the quiet, rural nature of the area.

Each of the named plaintiffs is also a member of plaintiff RICE. In addition, plaintiff Schneider testified that other individual members of RICE are similarly circumstanced and that among RICE's organizational purposes are the promotion of discussion to achieve rational energy, environmental and land use policies, and the protection of the rights and interests of its members. As a result, the Court concluded that RICE was properly before the Court in its representative capacity. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

Certainly plaintiffs have alleged such specific "injury in fact" as to distinguish this case from *Sierra Club v. Morton, supra*. Indeed, they have also demonstrated, by their geographical proximity to the NALF, at least as direct a stake in the controversy as plaintiffs in *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), wherein the Supreme Court held sufficient plaintiffs' claim of direct injury to "their use of the natural resources of the Washington Metropolitan Area" by the allowance of a rate hike to affect virtually all of the nation's railroads. *Id.* at 687, 93 S.Ct. at 2416. This Court concludes that plaintiffs' economic and aesthetic interests in the NALF environs have been injured by the feasibility testing and are threatened by the resumption of such testing as well as the eventual construction of a nuclear power plant. There can be no question that the environmental interests which plaintiffs seek to protect are "within the [zone of] interests to be protected" by NEPA. *SCRAP, supra* at 686 n. 13,

17. By letter of April 28, 1975, and accompanying documents whose authenticity has not been disputed, counsel for the plaintiffs advised the Court and opposing counsel that the respective positions of the House Sub-committee, as expressed in exhibit 98, and of the Fish and Wildlife Service, as expressed in exhibit 33, *see* note 6 *supra*, have not changed.

93 S.Ct. at 2415. *See Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). *See also Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1324 (8th Cir. 1974) (en banc).

The Court's jurisdiction to review the alleged NEPA violation has not been questioned and is premised on 28 U.S.C. § 1331(a) and 5 U.S.C. § 701 *et seq. Silva v. Lynn,* 482 F.2d 1282, 1283 (1st Cir. 1973); *Save Our Sound Fisheries Association v. Callaway,* 387 F.Supp. 292, 297–298 (D.R.I.1974) and cases cited therein.

## FPAS

██ We must turn now to the question of plaintiffs' standing to challenge defendants' actions as violative of FPAS. In essence, plaintiffs contend that the FPAS required GSA to dispose of the NALF pursuant to inflexible priorities which gave a preferred, if not absolute, right to the FWS to acquire the property, and further established a preference for conveyance to public agencies over private, and by competitive bidding over negotiated sale. If plaintiffs' contentions are correct, it is obvious that GSA ignored all of these requirements. It is equally obvious, however, that none of these unsuccessful bidders is before the Court. Unlike the unsuccessful bidder, who seeks to improve his position to acquire property by challenging government disposal procedures, plaintiffs' injury and challenge are less direct, and result from a fortuitous combination of circumstances. It just happens in this case that the federal agency which seeks to acquire the NALF would use it for the creation of a waterfowl refuge, a use which plaintiffs obviously prefer over a nuclear power plant. In another case the federal agency might want to construct a post office or a submarine base. These plaintiffs' interest in government compliance with the FPAS is thus tied directly to their view of the desirability of the ultimate user of the property.

In *Data Processing Service v. Camp, supra,* and *Barlow v. Collins, supra,* the Supreme Court established a two-part test to determine a plaintiff's standing to challenge agency action under § 10 of the Administrative Procedure Act, 5 U. S.C. § 702, in the absence of an express grant of standing by Congress. First, the challenged action must be shown to have caused the plaintiff "injury in fact," and second, the alleged injury must be shown to have been to an interest which "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing, supra* at 153, 90 S.Ct. at 830. *See United States v. SCRAP, supra* at 686, 93 S.Ct. 2405.

The defendants argue that no one outside of the federal government meets the second part of this test because the FPAS, like other statutes regulating the manner in which the federal government makes contracts to acquire or dispose of property and equipment, was "enacted solely for the benefit of the Government and confer[s] no enforceable rights upon persons dealing with it." *George Epcar Company v. United States,* 377 F. 2d 225, 227 (10th Cir. 1967). *Cf. Merriam v. Kunzig,* 476 F.2d 1233, 1241 (3d Cir. 1973), *cert. denied sub nom. Gateway Center Corp. v. Merriam,* 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149. This argument has been rejected in recent decisions of the Circuit Courts of Appeals for the District of Columbia and Third Circuit, and the Court of Claims, these courts concluding that an unsuccessful bidder is within the zone of interests to be protected by applicable government procurement and disposal statutes. *See, e. g., Merriam v. Kunzig, supra; Ballerina Pen Co. v. Kunzig,* 140 U.S.App.D. C. 98, 433 F.2d 1204 (1970), *cert. denied sub nom. National Industries for Blind v. Ballerina Pen Co.,* 401 U.S. 950, 91 S. Ct. 1186, 28 L.Ed.2d 234; *Keco Indus-*

*tries, Inc. v. United States,* 428 F.2d 1233, 192 Ct.Cl. 773 (1970); *Scanwell Laboratories v. Shaffer,* 137 U.S.App.D. C. 371, 424 F.2d 859 (1970). *Cf. Davis Associates v. Secretary, Department of Housing and Urban Development,* 498 F.2d 385 (1st Cir. 1974). *But see Edelman v. Federal Housing Administration,* 382 F.2d 594 (2d Cir. 1967); *George Epcar Company v. United States, supra.*

However, plaintiffs' position herein is not like that of a disappointed bidder, who, invited to do business with the government, has acted in reliance upon government adherence to statutory and regulatory mandates. *See Merriam v. Kunzig, supra* at 1242 and n. 7; *Keco Industries v. United States, supra* at 1237. Plainly, plaintiffs could not have been bound by the terms of FPAS, nor were they intended to benefit from it in any way distinguishable from the generalized benefit to the nation's citizenry which is to be expected from efficient utilization of government resources. 40 U.S.C. § 471. *See United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Plaintiffs' status as owners of adjacent land does not alter this conclusion: it would be odd indeed for a court to hold that abutters of federal property may police disposal of that land even though they previously had no right, other than in nuisance or trespass, to challenge how the government made use of it. Finally, protection of plaintiffs' interest in ensuring efficient use of government resources appears to have been delegated to the congressional "watchdog" committees established by the FPAS to oversee disposal actions by negotiated sale such as this one. *See* 40 U.S.C. § 484(e)(6). To the extent that this observation relates to the question of plaintiffs' standing, *see* Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367, 371 (1968), *but see Barlow v. Collins, supra* at 169 n. 2, 90 S.Ct. 832 (Brennan, J. concurring in result and dissenting in *Barlow* and *Data Processing v. Camp, supra*); *Hahn v. Gottlieb,* 430 F.2d 1243, 1249 (1st Cir. 1970), it reinforces my conclusion that plaintiffs have failed to show that the injury suffered by them was to an interest which "is arguably within the zone of interests to be protected or regulated by the statute . . . in question." [18] *Data Processing, supra* at 153, 90 S.Ct. at 830.

18. The conclusion that plaintiffs do not have standing to challenge the defendants' actions under the FPAS causes the Court grave concern in view of this record, which demonstrates that GSA violated the spirit, if not the letter, of the FPAS. Defendants' argument that FWS' right to obtain the property was extinguished by its failure to express its interest before the NALF was declared "surplus" flies in the face of the express policy of the FPAS "to promote the maximum utilization of excess property by executive agencies," 40 U.S.C. § 483(a), by the transfer, as far as practicable, of excess property to other federal agencies. 40 U.S. C. § 483(c)(2). Certainly at the time FWS expressed its interest on May 23, 1974, GSA had not irretrievably obligated itself to transfer the NALF to any other interested party.

Additionally, the record reveals defendants' argument to be nothing more than the "post hoc rationalizations" of counsel and therefore requires close and critical review. *See* *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419, 420, 91 S.Ct. 814, 28 L. Ed.2d 77 (1971). The issue of FWS' untimely application surfaced only in defendants' post-trial brief, whereas the record is replete with assurances to citizens and Congressmen that FWS' request was proper and would be given full consideration. (*E. g.,* Exh. 41, 42, 46–48, 51–54). *See* note 14 *supra.* Regional Administrator Gammal's letter of November 12, 1974, which formally rejected the FWS request made absolutely no mention of the tardiness of the request as a basis for rejecting it, but purported to reject it on the merits. (Exh. 89). At the same time, neither GSA's "Explanatory Statement" to Congress (Exh. 81) nor its determination that no environmental impact statement was required by NEPA (Exh. 79, 83) made any reference whatsoever to the FWS' outstanding request or the reasons for its rejection.

By this discussion I intimate no views as to the proper construction to be given the

## Violation of NEPA

We now turn to plaintiffs' claim that defendants have not complied with the mandates of NEPA. Our inquiry has been substantially narrowed by the defendants' concession that a final decision to convey the NALF to Narragansett to erect a nuclear power station is a "major federal action significantly affecting the quality of the human environment" within the meaning of § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), which requires the preparation of an EIS. The only issue before the Court concerns the timing of the impact statement. In *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973), cited by both plaintiffs and defendants, the D.C. Circuit, per Judge Wright, addressed the question of the proper timing for an EIS to assess the environmental balance sheet of an AEC research program to develop the technology necessary to create operational "fast breeder nuclear reactors."

> "In our view, the timing question can best be answered by reference to the underlying policies of NEPA in favor of meaningful, timely information on the effects of agency action. In the early stages of research, when little is known about the technology and when future application of the technology is both doubtful and remote, it may well be impossible to draft a meaningful impact statement. Predictions as to the possible effects of application of the technology would tend toward uninformative generalities, arrived at by guesswork rather than analysis. NEPA requires predictions, but not prophecy, and impact statements ought not to be modeled upon the works of Jules Verne or H. G. Wells. At the other end of the spectrum, by the time commercial feasibility of the technology is conclusively demonstrated, and the effects of application of the technology certain, the purposes of NEPA will already have been thwarted. Substantial investments will have been made in development of the technology and options will have been precluded without consideration of environmental factors. Any statement prepared at such a late date will no doubt be thorough, detailed and accurate, but it will be of little help in ensuring that decisions reflect environmental concerns. Thus we are pulled in two directions. *Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process.*" *Id.* at 1093–1094 (emphasis added) (footnotes omitted).

The court in *Scientists' Institute* concluded that an agency decision that the time is not yet ripe for the preparation of an EIS should be reviewed under a "'rational basis' test, under which the court will reverse the agency's decision if it has no warrant in the record [before the district court] and no reasonable basis in law" as set forth in *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). *Scientists' Institute, supra* at 1095 n. 68.

■ Upon a review of the policies underlying NEPA, decisional law, and the facts of this case, this Court like-

---

FPAS and applicable regulations. However, even a cursory review of the record reveals that GSA internally took great liberties with its own publicly stated interpretation of the disposal procedures it must follow. *See* note 14 *supra*.

In view of my conclusion that plaintiffs lack standing under FPAS, I do not reach the question of mootness which is implicated by the formal opposition of the House Subcom-

mittee to the proposed sale to Narragansett. (Exh. 98). This issue was not briefed by the parties. However, the proposition *arguendo* that such opposition effectively blocked the sale as presently contemplated would not dispose of the issues raised under NEPA, discussed *infra*, as to the separate decision of GSA not to prepare an EIS at this time.

wise concludes that an agency decision to defer filing of an EIS is reviewable, and that the proper standard of review is the "rational basis" test enunciated in *Scientists' Institute, supra.*

One of the two major purposes of NEPA, and embodied in the requirement that an impact statement be prepared in conformance with § 102(2)(C), 42 U.S. C. § 4332(2)(C), is to ensure that environmental concerns be made a meaningful part of the agency decision making process, by requiring that the agency engage in a systematic and scientific analysis of the environmental pros and cons of a proposal before committing the government to it.[19] It has frequently been recognized, in numerous judicial opinions,[20] in the statements and guidelines of the Council on Environmental Quality ("CEQ"),[21] established by NEPA to oversee its implementation, and is implicit in the Act itself, *see, e. g.,* 42 U.S.C. § 4332(2)(C)(v), that this purpose can be completely thwarted by the belated preparation and filing of an EIS. The decision to delay the preparation of an EIS until the final stages of a project, after all major decisions have been made, carries in it the danger that the statement's findings will have little or no input into the decision making process, thereby rendering the decision to defer preparation of the EIS into the functional equivalent of a decision not to file one at all. Indeed, in the case at bar GSA did file a negative declaration in conjunction with its report to Congress. And, if defendants' position prevails, it can be anticipated that no EIS

---

19. The other major purpose of the EIS is to implement NEPA's function as an environmental full disclosure law to inform the three branches of government and the public of the basis for agency action and its environmental implications. *See, e. g., Minnesota PIRG v. Butz, supra* at 1320; *Silva v. Lynn, supra* at 1284–1285; *Scientists' Institute v. AEC, supra* at 1091, nn. 48, 49; *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971).
The legislative history and Congressional comment on the purposes for which NEPA was enacted are explored in depth in *Calvert Cliffs' v. AEC, supra.*

20. *See, e. g., Scientists' Institute v. AEC, supra* at 1093, 1095; *City of Boston v. Volpe* 464 F.2d 254, 257 (1st Cir. 1972); *Lathan v. Volpe,* 455 F.2d 1111, 1121 (9th Cir. 1971); *Calvert Cliffs' v. AEC, supra* at 1128. *Cf. Save Our Sound Fisheries v. Callaway, supra* at 309.

21. CEQ, Third Annual Report 246 (Aug. 1972):
"* * * The Council believes that the consideration of environmental factors will be most effective if it comes in the early stages of program and project formulation. If the 102 process is not closely integrated at this early point, it risks becoming an overlay upon agency decision-making. And it tends to serve as a post facto justification of decisions based on traditional and narrow grounds. * * * "

Quoted in *Scientists' Institute v. AEC, supra* at 1093 n. 60.
The CEQ Guidelines for the preparation of environmental impact statements direct all agencies to prepare impact statements, where required, "[a]s early as possible and in all cases prior to agency decision concerning recommendations or favorable reports on proposals." 40 C.F.R. § 1500.2(a) (July 1, 1974). Furthermore, whether an EIS is required or not,
"[i]nitial assessments of the environmental impacts of proposed action should be undertaken concurrently with initial technical and economic studies." 40 C.F.R. 1500. 2(b).
The CEQ Guidelines further counsel:
"In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable. This can occur when one or more agencies over a period of years puts into a project individually minor but collectively major resources, when one decision involving a limited amount of money is a precedent for action in much larger cases or represents *a decision in principle about a future major course of action,* or when several Government agencies individually make decisions about partial aspects of a major action. In all such cases, *an environmental statement should be prepared if it is reasonable to anticipate a cumulatively significant impact* on the environment from Federal action." 40 C.F. R. § 1500.6(a) (emphasis added).

will be prepared until some time after Narragansett completes its on-site testing and applies for construction permits, a process which may require anywhere from one to seven years to complete.[22]

Thus we are faced, in a very real as well as a technical sense, with a decision not to file an EIS. The fact that an EIS will be filed "eventually" cannot be held to preclude judicial review, lest the important purposes of NEPA be entirely frustrated. And since this decision is so closely akin to a decision not to file an EIS at all, the Court is persuaded that no lesser a standard of review should be employed than that applicable to a "negative EIS declaration." Although a few of the courts first considering the proper scope of review of a negative declaration adopted the "arbitrary or capricious" standard of *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971),[23] a growing number of courts have expressly rejected that standard and have applied either the test of "reasonableness" enunciated in *Scientists' Institute v. AEC, supra,* or its rough equivalent.[24] To the extent that the two standards result in a different scope of review,[25] the

---

22. Although not in evidence, the affidavit of Robert Rice, counsel to GSA, does not alter the posture of this case in any material respect. The issue before the Court is not to determine *which* federal agency is to prepare an EIS which will consider all the alternative uses for the NALF, but *when* that EIS is to be prepared. In view of my decision that the EIS cannot await the completion of Narragansett's on-site testing and license applications with the AEC, it is clear that GSA must take primary responsibility in the preparation and filing of an EIS. The Rice affidavit does no more than to ascribe that responsibility to GSA as well.

23. *See, e. g., Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (*but see* Friendly, J., dissenting, 471 F.2d at 836) ; *Citizens For Reid State Park v. Laird,* 336 F.Supp. 783 (D.Me.1972) ; *Save Our Ten Acres v. Kreger,* 2 Env.L.Rep. 20305 (S.D. Ala.1972), *rev'd,* 472 F.2d 463 (5th Cir. 1973) ; *Goose Hollow Foothills League v. Romney,* 334 F.Supp. 877 (D.Or.1971) ; *Echo Park Residents Committee v. Romney,* 2 Env.L.Rep. 20337 (C.D.Cal.1971).

24. *See, e. g., Minnesota PIRG v. Butz, supra; Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (10th Cir. 1973) ; *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (5th Cir. 1973) ; *Concerned Residents of Buck Hill Falls v. Grant,* 388 F.Supp. 394 (M.D.Pa.1975) ; *SCRAP v. United States,* 346 F.Supp. 189 (D.D.C.1972), *rev'd on other grounds,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) ; *Natural Resources Defense Council, Inc. v. Grant,* 341 F.Supp. 356 (E.D.N.C.1972) ; *Scherr v. Volpe,* 336 F. Supp. 886 (W.D.Wis.1971), *aff'd on alternate holding,* 466 F.2d 1027 (7th Cir. 1972). *See also Ely v. Velde,* 451 F.2d 1130 (4th Cir. 1971). *Cf. Silva v. Romney,* 473 F.2d 287, 292 (1st Cir. 1973).

25. "In reviewing an agency decision that no impact statement was required for certain proposed federal action, the 2nd Circuit has recently rejected this approach in favor of the 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' standard of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A) (1970), as that test was interpreted by the Supreme Court in Citizens to Preserve Overton Park, Inc. v. Volpe, *supra* . . . *See* Hanly v. Kleindienst, *supra,* 471 F.2d at 828–830.
We think it largely irrelevant which standard of review is verbalized in the context of the instant case. Under *Overton Park* the court must first delineate the scope of the agency's authority and discretion under the governing statute and then determine 'whether on the facts the [agency's] decision can reasonably be said to be within that range.' 401 U.S. at 416, 91 S.Ct. at 823. Under the rational basis test, the court would have to determine whether the agency's decision had 'reasonable support in relation to the statutory purpose.' *See* Hardin v. Kentucky Utilities Co., 390 U.S. 1, 9, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). In the present case, the scope of the AEC's authority and discretion in determining when to draft a NEPA statement for its research and development program is defined specifically by reference to the underlying statutory purpose of timely and meaningful impact statements and, as a result, the two standards of review merge into one."
*Scientists' Institute v. AEC, supra* at 1095–1096, n. 68.
In view of the limited scope of discretion, if any, that NEPA affords an agency in implementing its mandate, I must conclude on this record that GSA's actions would not pass even the "arbitrary or capricious" test of *Overton Park v. Volpe, supra.* The record

Court is persuaded that only the more searching review required under the "rational basis" test is consonant with the mandatory language of NEPA and the high standards that it sets. *See Minnesota PIRG v. Butz, supra* at 1320–1322; *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244, 1250 (10th Cir. 1973). *See also Hanly v. Kleindienst,* 471 F.2d 823, 836 (2d Cir. 1972) (Friendly, J., dissenting), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974. *Cf. Silva v. Lynn, supra* at 1285.

 As noted above, one of the crucial goals of NEPA was to restructure agency decision making. If the instant case is any indication, the "action forcing" provisions of NEPA, *see Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1113 and n. 7 (1971), have not resulted in the agency self-policing contemplated. NEPA's reach is not limited to "major federal actions" within the meaning of § 102(2)(C), 42 U.S.C. § 4332(2)(C); only the requirement to prepare an EIS is. And yet this record amply demonstrates an utter disregard of environmental concerns by GSA despite its knowledge that the prospect of a nuclear power plant was unquestionably of environmental significance and wholly apart from the equally significant fact that a number of radically dif-

ferent uses for the NALF had been proposed by serious contenders for the property. Certainly these factors would suggest even to the most unwary that the environmental issues which would need to be considered would be far too complex to be handled in a cursory fashion. Even if the time was not ripe for preparation of an EIS at the end of May, 1974, NEPA nonetheless mandated that these environmental issues be examined, albeit in a less scientific fashion than that required to prepare an EIS.

Yet the record speaks to the contrary. When environmental issues were raised, it was done by members of the public or the FWS. The concerns that were voiced were either ignored by GSA or deferred. From the moment Narragansett submitted its request, all GSA energy was concentrated on reaching an accord between GSA, Narragansett, the State, and the Town, that a nuclear power plant, if feasible, be built. The justification for this, as appears in the record and argued to the Court, was the sense of urgency produced by the nation's "energy crisis," coupled with the "unique suitability" of the NALF as a nuclear power plant site.[26]

 I take judicial notice of the "energy crisis," which was heightened by the "Arab oil embargo" in the winter of 1973. However, the spectre of the "energy crisis" cannot be raised to excuse full compliance with NEPA as was rec-

is devoid of any agency consideration of the environmental consequences of the competing uses, other than at the August 22 meeting at which FWS comments were "dismissed with bureaucratic politesse." (Exh. 88). *See Silva v. Lynn, supra* at 1287 n. 6. Furthermore, the two-page document (Exh. 79) prepared by GSA in conjunction with its determination that no EIS need be prepared (Exh. 83), is grossly inaccurate in two critical respects: first, it omits any reference to the outstanding FWS request for roughly one half of the NALF to establish a refuge for migratory waterfowl; and second, it categorically states that there is no known historical significance to the property despite Mr. Williamson's report to GSA almost one month before that an important archaeological site had been identified there. (Exh.

99). These two misrepresentations alone mandate the conclusion that the negative determination was made arbitrarily and in total disregard of the administrative record which had been developed.

26. *See, e. g.,* Exh. 81, p. 4; 84, p. 3; 85, p. 3; 86. Defendants also refer to the passage of the "Federal Energy Act," 15 U.S.C. § 761 *et seq.,* to support the position taken by GSA, primarily as it applied to plaintiffs' FPAS challenge. Defendants do not contend, however, that either the President's April directive or the Federal Energy Act in any way diminished or altered the requirements of NEPA. Indeed the contrary is readily perceived in GSA's own regulation promulgated to implement the April directive and quoted in note 10 *supra.*

ognized in *Calvert Cliffs' v. AEC, supra* at 1119–1122, and in *Natural Resources Defense Council, Inc. v. Morton,* 148 U. S.App.D.C. 5, 458 F.2d 827, 834–835 (1972). *Cf. Scientists' Institute v. AEC, supra.* As the court noted in *Calvert Cliffs' v. AEC, supra* at 1122:

> "Whether or not the spectre of a national power crisis is as real as the [Atomic Energy] Commission apparently believes, it must not be used to create a blackout of environmental consideration in the agency review process."

GSA cannot cloak its actions from review by raising the mantle of the "energy crisis." On balance, I must also take notice of the fact that about as many "solutions" to the "energy crisis" have been proffered as there are proponents for them.

The sense of urgency which GSA derived from the fact of the "crisis" serves only to amplify the need for rigorous enforcement of NEPA. Rather than explore the merits of constructing a power plant on the NALF site as a partial "solution" to the problem, GSA appears to have acted on the belief that any addition to the domestic production of electrical power would be beneficial, no matter what the costs. Rather than examine the asserted suitability of the NALF as a power plant site, GSA relied on, without question, and *adopted as its own findings* points raised not by a neutral consultant, but by the very party seeking to convince GSA of the primacy of its position.

▇ It is obvious that compliance with NEPA, and in particular the re-

quirements for an EIS, will slow down the decision making process. It is equally obvious that the prospect of lengthier deliberations is an integral part of NEPA's mandate that agency decision making processes be altered so that environmental concerns can be identified and fully explored at the earliest stages of project planning. *See Calvert Cliffs' v. AEC, supra* at 1128. A well-intentioned, but misplaced, sense of urgency [27] can lead an agency, at the least, to make an irretrievable commitment of time and resources, if not also to commit itself to a project which later proves to be environmentally harmful.

▇ In the case at bar, GSA argues that it is too soon to file an EIS, and that the preparation of an EIS by GSA in which all competing uses will be considered should be deferred to coincide with the preparation of an EIS by the AEC in conjunction with Narrangansett's construction and licensing applications. Only at that time, GSA argues, will sufficient data have been obtained to determine if a nuclear plant is "technically and environmentally feasible." Defendants' Post-Trial Memorandum at 19–20.[28]

This argument proves too much. It aligns GSA's responsibilities with those of the AEC and presupposes the desirability of selling the land to Narragansett. The two inquiries are severable. The AEC responsibility would exist irrespective of the fact that the proposed site is owned by the government. *See* 42 U.S.C. § 2232. *Cf. Gage v. United States Atomic Energy Commission,* 156 U.S.App.D.C. 231, 479 F.2d 1214 (1973).

27. It is somewhat difficult to discern the basis for such a response to a project whose testing and licensing stage alone was forecasted as requiring up to seven and one half years to complete.

28. Defendants have also taken the inconsistent position that the execution of a conditional sales contract with Narragansett can be viewed separately from its decision, in principle, to sell Narragansett the NALF if environmental and AEC clearance is ob-

tained, and that, as such, the execution of the contract does not represent a "major federal action" within the meaning of § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). Such a position is completely at odds with the record, which demonstrates that the execution of the contract represents but one further link in an orderly chain of events which contemplates, assuming the necessary clearance, the ultimate sale to Narragansett. *See* CEQ Guidelines, 40 C. F.R. § 1500.6(a), quoted in note 21 *supra.*

As GSA now acknowledges, the AEC focus is strictly limited to the pros and cons of erecting a nuclear power plant; it does not consider that question in relation to any other possible use of the property. (Affidavit of Robert Rice). Thus, the fact that another EIS may have to be prepared does not relieve GSA of its duties under NEPA; it simply reminds us that the merits and demerits of a nuclear power plant may be the subject of further review by the AEC. If this factor has any bearing on the proper timing for GSA's EIS, it argues towards an *earlier* assessment by GSA of the competing interests than at the time of the licensing applications, since GSA could prepare its EIS on the assumption that the erection of a nuclear plant on the NALF is scientifically feasible and be comforted by the knowledge that such an assumption would be the subject of thorough AEC review on the basis of extensive scientific testing in the event of an initial decision to sell to Narragansett.

 Thus, in determining whether the proper time for the preparation of an EIS by GSA has arrived, this Court must focus on GSA's ability at the present time to make the environmental forecasts specified in subsections (i) through (v) of § 102(2)(C), 42 U.S.C. §

4332.[29] As Judge Wright recognized in *Scientists' Institute v. AEC, supra* at 1094, this inquiry requires a balancing process to reconcile the conflict between the need to rely on accurate information and the need to obtain an environmental analysis early enough to be made a part of the decision making process.

 GSA's sole argument that the time for an EIS is not yet ripe is that Narragansett needs to conduct further tests before it can be determined whether the NALF is a suitable site for a nuclear power plant. GSA gives no indication of what steps GSA plans to take in this interim period. The argument overlooks the fact that enough is already known about the NALF to convince first Narragansett and then GSA of its "unique suitability" as such a site. The record demonstrates that enough is known about the operation of nuclear power plants in general and the physical characteristics of the NALF in particular to have made it possible for Narragansett to specify that it would require all but 50–55 acres of the property, and to commission an archaeological study of the NALF based on projected dimensions of the power plant. *See* note 8 *supra*. The fact that construction of a power plant might prove scientifically impossible, or may eventually entail

---

29. § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), provides:

"Sec. 102. The Congress authorizes and directs that, to the fullest extent possible:
. . . (2) all agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes."

structural modifications, does not eradicate GSA's ability today to forecast the environmental impact of the power plant on the basis of projected dimensions, asserted suitability, and the knowledge derived from experience with other nuclear power plants and their effects on the environment.

> "Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Scientists' Institute v. AEC, supra* at 1092.

GSA's ability today to identify alternative uses of the NALF is beyond dispute. In fact, no occurrence between today and the time when GSA proposes to prepare an EIS can be expected to enhance GSA's ability to evaluate the desirability or environmental effects of these competing interests. The conditional sales contract would permit only Narragansett to have access to the property for testing. Even the government would be excluded.[30]

Lastly, GSA's argument obscures the fact that the decision to reserve the NALF to Narragansett alone for a period of up to seven and one half years in the face of these competing interests itself involves an "irreversible

and irretrievable commitment of resources," which should be explored before going forward. *See* 42 U.S.C. § 4332(2)(C)(v). To await the completion of site-testing in one or two or five years only to reject the proposal on the ground that construction of a power station, although scientifically feasible, is a less desirable use of the property obviously represents a waste of time and resources. *Cf. Jones v. Lynn,* 477 F.2d 885, 890–891 (1st Cir. 1973). It is also a dangerously unrealistic proposition. By that time the agency commitment to the project, proved to be scientifically sound, will have increased. At the same time, the politically embarrassing prospect of acknowledging that the waste of a great deal of time and resources could have been so easily avoided will militate against the agency's ever reaching such a conclusion. *Cf. Silva v. Romney,* 473 F.2d 287, 291 (1st Cir. 1973).

Thus, the Court must conclude that there is no rational basis to support GSA's conclusion that it need not prepare and file an EIS prior to executing a conditional sales contract with Narragansett.[31] *See Scientists' Institute v. AEC, supra* at 1095–1098. The defendants are therefore enjoined from taking any further action with regard to the proposed disposal to Narragansett until they have prepared and circulated a draft environmental impact statement

---

30. *See* note 16 *supra.* The potential advantage conferred upon Narragansett by this situation is not difficult to discern. If GSA defers the EIS until Narragansett completes testing, GSA will be forced to assess Narragansett's proposal, backed by precise and voluminous data, against proposals for alternative uses which cannot be expected to be much more developed than when originally formulated in May, 1974. In such a case GSA understandably could not avoid being favorably impressed by the thoroughness and predictability of Narragansett's proposal as compared to all others. With Narragansett alone entitled to possession, over the course of time the NALF may become firmly associated with its project, and/or other parties may lose interest, thereby virtually assuring a favorable GSA report for the power plant, unless, of course, that project is not scientifically

feasible. Certainly such decision making by default is one of the bureaucratic pitfalls NEPA was enacted to prevent. Furthermore, allowing GSA to defer such consideration until the AEC prepares an EIS would only compound the injury to NEPA policies and mandates already inflicted by GSA's failure to give environmental concerns any serious consideration to date.

31. I hasten to point out that this conclusion should not in any respect be interpreted as an indication of the Court's views on the relative merits of the proposed disposal or any other proposed use of the property. That issue it not before the Court. The Court expresses no views upon it and indeed lacks any knowledge upon which to make such an assessment.

**62**

and filed a final EIS in accordance with NEPA and applicable regulations.[32]

*Attorneys' Fees*

 In view of the valuable public service performed by plaintiffs and their counsel in commencing and ably prosecuting this action to compel agency adherence to NEPA, it is with regret that the Court concludes that it is without authority to award plaintiffs the attorneys' fees that they seek. Both the United States Supreme Court's unequivocal decision in *Alyeska Pipeline Service Company v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) and the express prohibition of such an award in 28 U.S.C. § 2412 compel this conclusion.[33] *See Alyeska Pipeline v. Wilderness Society, supra* at 267

n. 40, 95 S.Ct. 1612, n. 40. *See also Committee on Civic Rights of the Friends of the Newburyport Waterfront v. Romney,* 518 F.2d 71 (1st Cir. 6/13/75).

As the Supreme Court noted in *Alyeska Pipeline,* Congress has in a number of enactments expressly provided for the recovery of attorneys' fees. *Id.* at 260 n. 33, 95 S.Ct. 1612, n. 33. In the area of environmental legislation in particular, since the passage of NEPA Congress has frequently made provision for attorneys' fees,[34] apparently in recognition of the fact that "only private citizens can be expected to 'guard the guardians.'" *La Raza Unida v. Volpe,* 57 F.R.D. 94, 101 (N.D.Cal.1972). The case at bar provides but one further testimonial for the need to encourage pri-

32. In view of my ruling, I do not reach plaintiffs' claim that the defendants also violated applicable regulations of GSA and the CEQ. This Court has reviewed the recent decision of *Aberdeen and Rockfish Railroad Co. v. SCRAP,* — U.S. —, 95 S.Ct. 2336, 45 L.Ed.2d 191 (6/24/75). Although not entirely free from doubt in view of the brief treatment the Court gave to its consideration of a procedural requirement of NEPA, the Supreme Court's decision therein appears to be limited to the precise and somewhat technical question before it—one which is not at issue in the case at bar. To the extent that the Supreme Court's decision therein has any application to the case at bar, the Court concludes that it supports my determination herein.

33. 28 U.S.C. § 2412 in pertinent part provides:
"Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title but not including the fees and expenses of attorneys may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or official of the United States acting in his official capacity, in any court having jurisdiction of such action."
It may be argued that an official who pursues a course of action in bad faith is not "acting in his official capacity" and can therefore be subject to an assessment of attorneys' fees under the long-recognized exception to the so-called "American rule." *See Alyeska Pipeline, supra* at 257, 95 S.Ct.

1612; *F. D. Rich Co., Inc. v. Industrial Lumber Co., Inc.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). To the extent that such an argument is tenable, the Court is nonetheless unable to conclude on the basis of this record that the Administrator of GSA, the only named individual defendant, acted in bad faith in this disposal action. There is much evidence in the record of the Administrator's personal interest in the NALF and an expeditious disposal to Narragansett. (*E. g.,* Exh. 69, 70, 73a, 78). However, there is not sufficient evidence to show that the Administrator personally directed or acquiesced in a course of conduct to evade NEPA requirements. Indeed, it it doubtful that the attempt to make such a showing could be launched without extensive deposition or the presentation of live witnesses, possibly including the Administrator himself. The irony behind this observation lies in the recognition that, in light of the *Alyeska Pipeline* decision, few "public interest" litigants will decide to venture the additional expense which would generally be required to make such a showing.

34. *See* Clean Air Amendments of 1970, 42 U.S.C. § 1857h–2(d); the Air Pollution Amendments of 1970, P.L. 91–604, § 12(a), 84 Stat. 1706 (Dec. 31, 1970); the Noise Control Act of 1972, 42 U.S.C. § 4911(d); the Ocean Dumping Law of 1972, 33 U.S.C. § 1415(g)(4); and the Water Quality Amendments of 1972, 33 U.S.C. § 1365(d).

vate litigants to bring actions to effectuate the strong Congressional policies embodied in NEPA. *See, e. g., Sierra Club v. Lynn,* 364 F.Supp. 834, 848 (W.D. Tex.1973), *modified,* 502 F.2d 43 (5th Cir. 1974), *cert. denied,* 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975); *La Raza Unida v. Volpe, supra* at 99.

It may be that the time has come for Congress to reassess its failure to authorize recovery of attorneys' fees in private actions under NEPA. Obviously, this is a matter which must be left to Congress to determine. *See Alyeska Pipeline v. Wilderness Society, supra* at 240, 95 S.Ct. 1612. *Cf. Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

Plaintiffs shall enter an order accordingly.