**RHODE ISLAND COMMITTEE ON ENERGY et al.**

v.

**GENERAL SERVICES ADMINISTRATION et al.**

Civ. A. No. 74-272.

United States District Court, D. Rhode Island.

April 6, 1976.

**324**

Myron M. Cherry, Chicago, Ill., Thomas C. Mullaney, Jr., Providence, R.I., for plaintiffs.

Lincoln C. Almond, U.S. Atty., R.I., Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., for defendants.

## MEMORANDUM AND ORDER

PETTINE, Chief Judge.

In a written opinion of July 8, 1975, in this matter, *Rhode Island Committee on Energy v. General Services Administration*, 397 F.Supp. 41, this Court concluded that the defendants must be "enjoined from taking any further action with regard to the proposed disposal to Narragansett [Electric Company] until they have . . . filed a final EIS [Environmental Impact Statement] in accordance with NEPA [the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*] and applicable regulations." *Id.* at 61–62 (footnote omitted).

The Court also determined that, since plaintiffs did not have standing to attack the defendants' actions as violative of the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471, *et seq.* ("FPAS"), it could not reach that issue. *Id.* at 53–54 and n. 18.

The next step would have been for the Court to enter an order in conformance with the July 8, 1975, opinion. *Id.* at 63. However, plaintiffs instead filed motions to amend their complaint and to join the Department of Interior ("DoI") as an involuntary party plaintiff in an effort to resolve the FPAS issue on its merits.

The Court set the matter down for hearing on December 1, 1975, and continued it to March 15, 1976, in order to determine DoI's position in this matter. At the March 15, 1976, hearing, the following representatives of DoI testified: Douglas P. Wheeler, Deputy Assistant Secretary for Fish and Wildlife and Parks, William C. Ashe, Deputy Regional Director, Fish and Wildlife Service ("FWS") for Region 5, and David Lindgren, Deputy Solicitor of DoI. With one exception, on the need for an EIS as part of a transfer to FWS, *see* note 2, *infra*, their testimony was consistent, though not necessarily logical, in presenting DoI's position with reference to the property in question, the Naval Auxiliary Landing Field ("NALF") at Charlestown, Rhode Island, and to the instant litigation. As to the NALF, the DoI stands by its request for the transfer of a specified portion of the NALF of approximately 367 acres as federally-owned "excess" property. This request was first made by letter of May 23, 1974, *quoted in* 397 F.Supp. at 45 n. 6, and renewed by letter of September 23, 1975 (Exh. 9, 3/15/76 hearing), in virtually identical language. This request has never been altered or withdrawn. and is authorized by DoI's Washington office.

It is also DoI's position that in this case, in the absence of competing federal requests for the land, applicable statutes and regulations mandate that GSA, which is charged with disposal of the NALF, transfer the specified property to

DoI. DoI, like the plaintiffs, contends that under these circumstances GSA is legally bound to honor DoI's request and has no discretion to refuse it. GSA disagrees. This legal dispute has arisen between DoI and GSA before, but has never been resolved, either internally by the Attorney General of the United States, or by the courts.

Nevertheless, DoI does not seek to have the issue litigated; it does not want to join this law suit. Believing that the Executive branch should "speak with one voice," it will, if necessary, seek a binding determination by the Attorney General. It does not, however, feel that the time is ripe to make such a request. DoI prefers to await preparation of the final EIS to be ordered by this Court. It believes that the environmental data produced by this study will enable it to re-evaluate its pending request and make a more informed decision as to whether the request should be reaffirmed, enlarged, reduced, or its configurations altered. The possibility that DoI at that time would abandon its request entirely was dismissed by Deputy Solicitor Lindgren as "so remote that I really can't conceive of it". When all the environmental data are in, if GSA persists in its refusal to honor DoI's request, original or as modified, DoI will then seek resolution by the Attorney General. Whatever that outcome, the matter will not be litigated.

If it were not for the unusual history of this case,[1] DoI's interest in maintaining interdepartmental "unity" would be an entirely understandable and defensible position. However, it is their prerogative and, absent their willingness to be joined as a voluntary party, this Court has no business intruding on an executive decision unless required to do so as discussed below.

Whether or not the DoI can be joined as an involuntary party is dependent on the testimony produced at the March 15, 1976, hearing.

Mr. Ashe testified that due to the ambiguous notice of "excess" lands at "Quonset Point, Rhode Island" of November 9, 1973, see 397 F.Supp. at 44–45 and nn. 5–6, staff members of the FWS in Boston consulted GSA's Boston real estate division and were assured that the NALF was *not* included in the specified parcel. The first definitive news came to FWS when the NALF was declared "surplus" and available to nonfederal agencies. This Court concluded that as of December, 1974, GSA had never seriously considered FWS' request and criticized GSA's belated argument that FWS had failed to make a timely request. 397 F.Supp. at 49, 54 n. 18. The presentation at the March 15, 1976, hearing strongly indicates that GSA's attitude has not changed. Counsel for plaintiffs cast considerable doubt upon the wisdom of DoI's belief that it would gain valuable new information from an EIS. He introduced several documents (Exh. 5, 3/15/76 hearing) which indicate that GSA's own resources to prepare the EIS are very limited and that its attempt to secure assistance from DoI has resulted only in the production of the very "Biological Reconnaissance Report" (Exh. 2, 3/15/76 hearing) which formed the basis for FWS' original request. Mr. Ashe, DoI's expert in the field, testified that the Department's decision not to press its request until an EIS had been prepared was highly unusual. He did not agree with one of the premises underlying that decision, *i.e.,* to determine the compatibility of the wildlife refuge and a nuclear power plant, because he and his staff had concluded that the two projects were basically incompatible on this site. Mr. Ashe did not indicate that his was a preliminary or tentative judgment or that he needed further data to formulate this assessment. In a memorandum for the files of October 1, 1975 (Exh. 10, 3/15/76 hearing), he indicated a growing sense of frustration which he shared with Regional Solicitor Bill Redmond:

---

1. *See RICE v. GSA,* 397 F.Supp. at 48-51, 54-55, nn. 14, 18.

"However, I gather that Mr. Redmond feels that the die is cast, and in contradiction to Judge Pettine's opinion [of July 8, 1975], in contradiction to what GSA officials have told him, and in contradiction to what we feel the requirements of the Federal Property and Administrative Services Act are, that GSA has already made a decision as to the disposition of the above excess lands. The lands are going to be turned over by GSA to Narragansett Power Company for a nuclear power plant site. I expect this is so."

This memorandum reflects further action to be taken by Ashe and Redmond which Mr. Ashe considers the impetus for Deputy Solicitor Lindgren's strongly worded letter of October 30, 1975, to GSA's Acting General Counsel Donald P. Young (Exh. 3, 12/1/75 hearing). That letter clearly states DoI's position as to its legal entitlement to the land requested. It also reflects the Department's frustration with GSA handling of the matter:

"We are not confident that the deficiencies which we, and apparently the district court, see in the prior handling of this matter are being eliminated by the present procedures being followed as a result of the district court decision. We do not understand the basis upon which simultaneous notices to Federal agencies of excess property and to non-Federal public and private interests of possible surplus property can be issued. We find nothing in the statute or your regulations which authorizes this unusual procedure. . . We can only assume that the simultaneous publication of these notices and the response to them will prejudice objective consideration of the FWS interest in the property and that GSA remains intent upon disposing of this property as surplus to Narragansett."

Further, in this letter, Deputy Solicitor Lindgren contended that the proposed transfer of land to FWS would not require the preparation of an EIS. This issue will be discussed, *infra*.

In essence the plaintiff argues the path now being followed, *i.e.*, the Department's position that it is content to await preparation of a final EIS, is inconsistent with its prior position and will ultimately result in the abandonment of FWS's request, not on its merits but as part of a political deal; thus clearing the way for transfer of the NALF to Narragansett with a minimum of controversy. In support thereof they have proffered a memorandum from DoI's files, dated November 10, 1975, which states in part:

"Evidently Undersecretary-designate Frizzell recently made a commitment to Administrator Zarb [of the Federal Energy Administration] that FWS would not press the issue. However, this commitment was apparently not communicated to FWS or the Solicitor's Office: On October 30, 1975 (copy attached), the Deputy Solicitor sent a strong letter to the Acting General Counsel of GSA which reaffirmed FWS's interest in Charleston [*sic*] and questioned whether GSA's current handling of the problem squares with the court's decision. It is presumed that Mr. Zarb's call will center on this reversal.

Assistant Secretary Reed has called for a briefing at 11:00 a.m. tomorrow on the wildlife values of the area and the possibility of coexistence between a refuge and a nuclear plant on this site. However, because of the lawsuit and the October 30 letter, it would appear extremely difficult for FWS now simply to drop its claim for Charleston [*sic*]."

Exh. 1 (3/15/76 hearing).

As a result of their interpretation, plaintiffs could not agree with this Court's suggestion that a consent decree be issued staying further proceedings until GSA has prepared an EIS.

■ These facts and circumstances, standing alone, do not give the Court authority to join the DoI. Its present position is clear: it does not seek to join this law suit and it contemplates no action which would result in its ever be-

coming a party to litigation concerning the NALF. Plaintiffs based their motions to join DoI and amend their complaint upon the goal of conserving judicial energy, *Gentry v. Smith*, 487 F.2d 571, 579–580 (5th Cir. 1973), by avoiding unnecessary or duplicitous litigation. DoI's present posture has undercut the foundation of these motions, which are therefore denied.

■ This decision does not end our inquiry, however. In the course of considering plaintiffs' motions, the Court has been compelled to question seriously the propriety of entering an injunctive order in conformance with its July 8, 1975, opinion without making further inquiry as to the legal ramifications of DoI's outstanding request for over half of the NALF. In fashioning injunctive relief, a court is exercising equitable powers which are left to its sound discretion. *Inland Steel v. United States*, 306 U.S. 153, 156, 59 S.Ct. 415, 417, 83 L.Ed. 557, 560 (1939); *Berman v. Narragansett Racing Ass'n*, 48 F.R.D. 333, 336 (D.R.I.1969). The cases are legion in affirming a court's power and indeed responsibility to consider the public interest and the interest of third parties in determining the scope and propriety of interim and final injunctive relief. In *Inland Steel v. United States, supra* at 157, 59 S.Ct. at 417, 83 L.Ed. at 560, the Supreme Court stated that it is a "governing principle that it is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all—including the public—whose interests the injunction may affect." (Footnote omitted). In *Virginian Ry. Co. v. System Federation No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), the Supreme Court looked to "the history of the legislation now before us, the reports of committees of Congress having the

proposed legislation in charge, and . . . our common knowledge" in order to determine whether the public interest was served by the injunctive relief there under consideration. *Id.* at 551–552, 57 S.Ct. at 601, 81 L.Ed. at 802. In explaining the reason for this inquiry, the Court stated at 552, 57 S.Ct. at 601, 81 L.Ed. at 802:

"More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies . . . is a matter of public concern. . . . Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

(Citations omitted.)

*See also Buchanan v. United States Postal Service*, 508 F.2d 259 (5th Cir. 1975); *Stamicarbon, N.V., v. American Cyanamid Co.*, 506 F.2d 532 (2d Cir. 1974); *Conservation Council of North Carolina v. Costanzo*, 505 F.2d 498 (4th Cir. 1974); *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917 (3d Cir. 1974); *Minnesota Bearing Co. v. White Motor Corp.*, 470 F.2d 1323 (8th Cir. 1973); *Quaker Action Group v. Hickel*, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969); *Palmigiano v. Travisono*, 317 F.Supp. 776 (D.R.I.1970). *See generally* 11 Wright & Miller, Federal Practice & Procedure: Civil § 2942.

■ With this "governing principle" in mind, the Court cannot simply order GSA to prepare an EIS without first exploring the possibility that, due to DoI's assertedly paramount interest in the NALF, no EIS either as to the entire NALF, or as to any part of it, is required by NEPA.[2]

2. GSA's apparent willingness to prepare an EIS does not relieve the Court of its responsibility to make this inquiry, which is focused on the propriety of a court order *requiring* GSA to prepare an EIS.

In its Memorandum and Order of February 25, 1976, the Court first posed the questions implicated in documents submitted in support of plaintiffs' motions. In Deputy Solicitor Lindgren's letter of October 30, 1975 (Exh. 3, 12/1/75 hearing), he asserted:

"The [Court's] decision [of July 8, 1975] requires the preparation of an impact statement before disposition of surplus property

Thus the Court has before it the following issues:

1. In light of the DoI's outstanding request for a portion of the NALF, can this Court require an EIS as ordered July 8, 1975, when none might be required for a transfer to another federal agency?

2. Does the answer to question number 1 require this Court to interpret the FPAS and determine whether or not GSA has any discretion, in a situation as is presently before the Court, in transferring excess property to a nonfederal agency where a federal agency has requested the same?

3. If it is decided that the FPAS requires the property in question be transferred to DoI, would such a transfer require the preparation of an EIS of substantially the same scope as that contemplated in the July 8, 1975, opinion or would something less suffice, such as an environmental assessment?

4. Since the testimony now shows DoI will reassess its position after an EIS has been prepared, and if it should still seek the land in question then resolve its position through a binding determination of the Attorney General, should this Court merely enter a declaratory judgment in accordance with the NEPA aspects of the July 8, 1975, opinion and limit any injunctive order to one prohibiting GSA from making the proposed disposal to Narragansett so long as the FWS request is outstanding?

I realize that the parties have already submitted certain memoranda, but it would greatly facilitate the Court's consideration if the respective legal arguments on all of the questions raised in the preceding paragraphs were consolidated in one superceding memorandum of law from each side. The Court also invites the Department of the Interior to submit a memorandum as *amicus curiae*. Finally, for the Court's convenience, it is requested that all references to legislative history, departmental regulations and manuals be accompanied by photocopies of the same. The parties shall have three weeks from the date of this order to submit memoranda and an additional week to file responding briefs.

---

to a private entity. It does not address the question of whether an impact statement would be required for the transfer of excess property to another federal agency. While an EIS could conceivably be required in particular circumstances, we suggest that an environmental assessment of a transfer of excess property to the FWS would be appropriate prior to reaching a decision that an EIS must be prepared. Such an assessment could result in a conclusion that the transfer of excess property to the FWS was not a major Federal action significantly affecting the human environment, and result in only a negative declaration."

This same assessment is repeated in paragraph 8 of Mr. Lindgren's affidavit of January 13, 1976; in Exhibit A to Myron Cherry's affidavit of February 9, 1976, the letter of Rep. Dingell of December 30, 1975, to GSA Administrator Eckerd; in a memorandum reflecting Regional Solicitor Redmond's analysis (Exh. 20, 3/15/76 hearing); and in a letter from Acting Secretary Frizzell to Rep. Dingell of February 20, 1976 (Exh. 23, 3/15/76 hearing). At the March 15, 1976, hearing Deputy Assistant Secretary Wheeler stated that DoI expected that the EIS to be prepared by GSA pursuant to court order would provide DoI valuable, new environmental data to assist in evaluating and possibly reformulating its outstanding request. At the same time, however, he indicated his belief that, absent such a court order, DoI would probably not be required to prepare an EIS as part of the requested transfer of excess property to it.

As indicated earlier, it was on this issue that the Department witnesses took conflicting positions. Reversing the earlier stance expressed by letter of October 30, 1975, quoted above, Deputy Solicitor Lindgren testified at the March 15, 1976, hearing that he believed NEPA would require the preparation of an EIS as to the entire NALF even as part of DoI's decision to request transfer of 367 acres to establish a wildlife refuge. The additional factor that DoI views preparation of an EIS under the present circumstances to be a "good idea" is of no moment; this Court must be convinced that the "good idea" is also legally mandated before it would use its extraordinary powers of equity to order one.