**CONCERNED CITIZENS OF RHODE ISLAND et al.**

v.

**NUCLEAR REGULATORY COMMISSION et al.**

Civ. A. No. 76–520.

United States District Court, D. Rhode Island.

April 19, 1977.

Addendum April 26, 1977.

Seth K. Gifford, Cynthia G. Collins, Providence, R.I., for plaintiff.

Thomas G. Dignan, Jr., Boston, Mass., Edward F. Hindle, Matthew F. Medeiros, Providence, R.I., James A. Fitzgerald, Nuclear Regulatory Commission, Washington, D.C., Everett C. Sammartino, Asst. U.S. Atty., R.I., Providence, R.I., for defendant.

## MEMORANDUM AND ORDER

PETTINE, Chief Judge.

### I

In this case, the Court is again asked to block a federal agency from proceeding further to consider the potential construction of nuclear power plants on former Navy land in Rhode Island.[1] Specifically, Concerned Citizens of Rhode Island (CCRI) and the other plaintiffs complain that the defendant Nuclear Regulatory Commission (NRC) is exceeding its authority by docketing and processing intervenor-defendant New England Power Company's application for permits to construct two light-water nuclear reactors to be built at the Naval Auxiliary Landing Field (NALF) in Charlestown.[2] They also complain that the NRC's study and evaluation of the environmental effects deriving from nuclear power plant construction at that location is beyond the authority of the NRC and violative of this Court's order in a related case, *Rhode Island Committee on Energy v. General Services Administration (RICE v. GSA)*, 397 F.Supp. 41 (D.R.I.1975). Both claims are premised on the fact that New England Power (NEP) does not own, or have legal right to control, the NALF site.

NRC and NEP have moved to dismiss the complaint on the grounds that plaintiffs have failed to exhaust administrative remedies; that the court lacks subject matter jurisdiction; and that plaintiffs have failed to state a claim on which relief may be granted. Viewing the plaintiffs' complaint under the standard enunciated in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the Court holds that the complaint must be dismissed.

The relevant allegations are as follows. The NALF is presently owned by GSA, which is under a court imposed duty to prepare an Environmental Impact Statement (EIS) examining, *inter alia*, costs and benefits of alternative uses for this surplus property. Only after that EIS is completed can GSA dispose of the NALF in accordance with the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471 *et seq.* (FPAS) as amended. *RICE v. GSA, supra.* That EIS is not expected to be completed until November 30, 1977 at the earliest.

Although NEP does not own or have legal right to control the NALF, it has long been interested in constructing a nuclear

---

1. See *Rhode Island Committee on Energy (RICE) v. GSA*, 397 F.Supp. 41 (D.R.I.1975) and 411 F.Supp. 323 (D.R.I.1976), and *Conservation Law Foundation v. GSA*, 427 F.Supp. 1369, No. 77–0015 (D.R.I. March 11, 1977). In *RICE v. GSA,* the Court required GSA to prepare an Environmental Impact Statement prior to executing a conditional contract to sell the property at issue here to the Narragansett Electric Company, a subsidiary of defendant New England Power Company. Narragansett planned then (as now) to construct nuclear reactors on that land. The Court enjoined execution of the contract reasoning that such a sale amounted to an "irreversible and irretrievable commitment of resources" requiring an EIS. *RICE v. GSA, supra,* 397 F.Supp. at 61.

2. Plaintiffs are the Concerned Citizens of Rhode Island (CCRI), an organization which has intervened in the NRC hearings at issue here; Samuel Seely, president of CCRI and an owner of land abutting the NALF and a recreational user of the land surrounding NALF; the Rhode Island Committee on Energy and its treasurer, Peter Hearn; and the town of Richmond, which lies within ten miles of the proposed nuclear facilities. Plaintiffs' standing has not been questioned, and it seems beyond dispute. *See Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *RICE v. GSA*, 397 F.Supp. 41, 52–53 (D.R.I.1975); *Conservation Law Foundation v. GSA*, 427 F.Supp. 1369, No. 77–0015 (D.R.I. March 11, 1977).

**630**

power plant at that site. NEP has made strenuous attempts to secure the NALF (through its subsidiary, Narragansett Electric Company) since 1974, attempts which the Court found had been unlawfully assisted by the GSA. *RICE v. GSA*, 397 F.Supp. at 61. The disturbing history of the dispute between environmentalists, NEP and GSA can be found in *RICE v. GSA*, 397 F.Supp. 41 and 411 F.Supp. 323. NEP has submitted applications to NRC for permits to construct two pressurized nuclear reactors at NALF and after preliminary staff review NRC informed NEP on September 29, 1976 that it had accepted the application and docketed it as "acceptably complete for commencement of a detailed review".[3] With reference to the fact that NEP did not own the site, NRC stated, "New England Power Company has informed us that acquisition of the site is the subject of litigation and if not resolved favorably an alternative site will be proposed." It is apparent from NRC regulations that an applicant must propose a particular site for the contemplated construction of a nuclear plant, and that the hearings which NRC must conduct must focus on a particular site as well. *See, e.g.,* 10 CFR §§ 50.-34(a)(1), 51.20.

**3.** The statutes governing NRC's consideration of construction permits are set forth at 42 U.S.C. §§ 2232, 2239. Implementing regulations appear at 10 C.F.R. §§ 50.20–35 (1976). *See also* 10 C.F.R. §§ 2, 51 (1976). Although different components of the NRC perform the various tasks comprising the total review process—initial review is undertaken by the staff, the hearings conducted by an Atomic Safety and Licensing Board, appeal is to the Atomic Safety and Licensing Appeal Board—the Court will refer simply to the NRC throughout this opinion for the sake of clarity and economy.

**4.** 28 U.S.C. § 2341 *et seq.* (Supp.1976), known as the Hobbs Act, makes reference to the Atomic Energy Commission (AEC). However, the Hobbs Act is made applicable to the NRC by the Energy Reorganization Act of 1974. *See* 42 U.S.C. § 5871(g) (Supp.1976).

**5.** Defendant NEP argues that the staff order docketing the NEP application is not reviewable by the Licensing Board, and therefore is presently reviewable in the Court of Appeals under the Hobbs Act. *See* Northeast Nuclear Energy Co. (Montague Nuclear Power Station Units 1 and 2), LBP–75–18, 1 NRCI 436, 437

## II

Defendants contend that this Court lacks subject matter jurisdiction to review the NRC order docketing NEP's application for further processing, including hearings. If that order is a "final order" in any proceeding for the "granting . . . of any license or construction permit", exclusive jurisdiction would be in the Court of Appeals. 42 U.S.C. § 2239(b) (1973); 28 U.S.C. § 2342(4) (Supp.1976).[4] Substantial authority indicates that the order at issue is not a final order under the relevant standards, and the Court will assume *arguendo* that the order is not presently appealable in the Court of Appeals. *See Ecology Action v. United States Atomic Energy Commission*, 492 F.2d 998 (2d Cir. 1974); *Citizens for a Safe Environment v. AEC*, 489 F.2d 1018 (3rd Cir. 1974); *Thermal Ecology Must Be Preserved v. AEC*, 139 U.S.App.D.C. 366, 433 F.2d 524 (1970).[5] However, even though the statutory language placing exclusive jurisdiction over "final orders" of NRC proceedings does not negate the existence of Administrative Procedure Act jurisdiction in this Court over other NRC orders,[6] such jurisdiction would exist in this case only if plaintiffs have satisfied two

(1975). Defendant NRC, on the other hand, contends that the docketing order will be reviewable in the Court of Appeals only at the conclusion of the licensing process, a view apparently shared by Judge Friendly. *See Ecology Action v. AEC*, 492 F.2d 998, 1001 (2d Cir. 1974). This Court need not resolve the matter, properly for the First Circuit, for whether or not jurisdiction of the docketing order exists at this time in the Court of Appeals, no such jurisdiction exists here.

It is worth pointing out that the Court rejects defendants' contention that any order not "final" under the Hobbs Act, 28 U.S.C. § 2342, is *ipso facto* not "final" for APA purposes. That argument has been consistently rejected by the courts. *See, e.g., Citizens for a Safe Environment v. AEC*, 489 F.2d 1018, 1020 (3rd Cir. 1974); *Pepsico, Inc. v. FTC*, 472 F.2d 179 (2nd Cir. 1972); *Izaak Walton League of America v. Schlesinger*, 337 F.Supp. 287 (D.D.C.1971).

**6.** *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (FDA); *Pepsico, Inc. v. FTC*, 472 F.2d 179 (2d Cir. 1972); *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) (NLRB); *Elmo Divi-*

necessary conditions imposed by the APA. First, plaintiffs must have exhausted any nonfutile administrative remedies by demonstrating that the remedy in the NRC, and eventually the Court of Appeals, is inadequate to protect their rights. *See, e.g., Nader v. Ray*, 363 F.Supp. 946, 954 (D.D.C. 1973); *Gage v. Commonwealth Edison Co.*, 356 F.Supp. 80, 84 (N.D.Ill.1972); *Izaak Walton League of America v. Schlesinger*, 337 F.Supp. 287, 291 and n. 14, 292 (D.D.C. 1973). Second, plaintiffs must allege a violation of a clear, non-discretionary legal duty breached by the NRC. *Izaak Walton League of America v. Schlesinger*, D.C., 337 F.Supp. at 291. *See also Gage v. AEC*, 156 U.S.App.D.C. 231, 479 F.2d at 1222; *Nader v. Ray*, D.C., 363 F.Supp. at 955. This rule embodies a functional definition of what is "final" for APA purposes, 5 U.S.C. § 704, and ensures that district court review does not impinge on the jurisdiction of the courts of appeals or unnecessarily divert the parties' attention from the administrative forum.

That plaintiffs here have satisfied neither requirement appears certain from closer examination of the case on which they principally rely, *Izaak Walton League of America v. Schlesinger*, the only case cited by plaintiffs in which a district court has taken jurisdiction and ordered the NRC (AEC) to do something in connection with nuclear power plant licensing and construction permits. The court held that only the Court of Appeals had jurisdiction over a count seeking review of certain regulations, but it assumed jurisdiction over second count, alleging a clear violation of the National Environmental Policy Act of 1969 (NEPA). The court stated:

While an operating license has not issued, the plaintiffs allege there has been a statutory violation because the AEC contends it is not required to issue a NEPA statement. In line with directing the AEC to issue the 102(2)(C) statement, plaintiffs seek a preliminary injunction

preventing AEC from issuing the license requested until such statutory compliance is fulfilled.

Intervenors contend, likewise, that this count should be dismissed for lack of jurisdiction. They argue that since the issuance by AEC of a license for interim operating authority is a final order, review is confined exclusively in the Court of Appeals.

Plaintiffs are not requesting review of the granting or denying of a license. They request this Court to direct the AEC to comply with a specific statutory mandate. In this regard the Court does have jurisdiction to consider the issues presented, namely, whether there has been a violation of a clear, nondiscretionary, legal duty.

337 F.Supp. at 291 (footnote omitted).

The Court also emphasized at length that plaintiffs had no other remedy:

Review in the Court of Appeals is unavailable or inadequate to protect plaintiffs' rights. Does the law, apart from the review provisions investing exclusive jurisdiction in the court of appeals, afford a remedy? This Court observes that plaintiffs lack an adequate remedy since appellate review is only available to parties to the proceeding. . . . The Government and intervenors make much of plaintiffs' failure to become parties to the proceedings. They contend the inadequacy of the appellate remedy is due solely to plaintiffs' failure to participate before the Commission. The argument is not convincing. Plaintiffs' opportunity to intervene occurred during the 30 day period commencing on March 16, 1971. The Court views with concern the fact that the manner in which the thermal effluents would be discharged into the Mississippi River (and the alleged dangers of such discharges) was not disclosed until April 30, 1971. Then, the 30 day period within which the plaintiffs could have

*sion of Drive-X Co. v. Dixon*, 121 U.S.App.D.C. 113, 348 F.2d 342 (1965) (FTC); *Deering Milliken, Inc. v. Johnston*, 295 F.2d 856 (4th Cir. 1971) (NLRB). Any jurisdiction over these

claims in this Court would be general federal question jurisdiction, 28 U.S.C. § 1331, over APA claims. *See Califano v. Sanders*, —— U.S. ——, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

become parties, and therefore could invoke the jurisdiction of the Court of Appeals, had expired.

337 F.Supp. at 292 (footnote omitted).

■ Plaintiffs' case here differs decisively from the situation presented in *Izaak Walton League of America, supra.* Plaintiffs have already intervened in the NRC proceeding, and may present all of their claims to the NRC.[7] Regulations ensure that the EIS will be considered in the hearing process, 10 CFR § 51.52. *See Calvert Cliffs' Coordinating Committee v. AEC,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). If NEP proves unable to produce the necessary environmental information because of its lack of ownership or control of NALF, plaintiffs have a remedy in the NRC hearing or later in the Court of Appeals. It can hardly be said that plaintiffs suffer present irremediable harm from an inadequate EIS which has not yet been prepared.[8] It appears certain that adequate remedies are available to plaintiffs which preclude this Court's jurisdiction. Plaintiffs have failed to exhaust their administrative remedies.

Nor have plaintiffs successfully alleged any violations of clear, non-discretionary legal duties which is the second requirement for the Court's jurisdiction. *Gage v. AEC, supra; Izaak Walton League of America v. Schlesinger, supra.* They point to four: (1) a violation of the Atomic Energy Act and the NRC's regulations by virtue of NRC's staff decision to review and hold hearings on the NEP application even though NEP does not yet own or control the NALF and despite the admitted incompleteness of the application; (2) a violation of NEPA by commencement of EIS preparation before the NALF is acquired by NEP; (3) a violation of this Court's order in *RICE v. GSA* by NRC's EIS preparation before GSA has completed its EIS; and (4) a violation of 10 CFR § 51.23 by commencing NRC hearings before local authorities have ever controlled the NALF.

■ As to the first no statute or regulation to which the Court has been directed requires an applicant to own a site before an application for construction or licensing on that site may be docketed or considered. *Compare Gage v. AEC, supra.* To the contrary, the Court is informed that NRC has a settled practice of permitting docketing and consideration of applications for after—acquired sites.[9] The real test is a practical

---

7. As defendants point out, this is one of the primary purposes served by the administrative hearing. *Union of Concerned Scientists v. AEC,* 163 U.S.App.D.C. 64, 499 F.2d 1069, 1094 (1974). Unless plaintiffs can present either clear violations of statutory duty to district courts, or administrative records to the courts of appeals, there is nothing solid for judges to evaluate, a problem exemplified by the conclusory and hypothetical harms pointed to by plaintiffs here. Compare the present case with a striking similar pair of cases, *Gage v. Commonwealth Edison Co.,* 356 F.Supp. 80 (N.D.Ill. 1972) and *Gage v. AEC,* 156 U.S.App.D.C. 231, 479 F.2d 1214 (1973). In those cases, plaintiffs argued that NEPA *forbids* site acquisition until AEC hearings were completed. Here, plaintiffs essentially contend that NEPA *requires* site acquisition before hearings are begun. As in *Gage v. AEC, supra,* plaintiffs here ask the Court to accept as "fact" harms which are speculative at best, and ignore unintended side effects which their interpretation of regulations might entail. For example, interpreting NRC regulations to require an electric utility company to acquire a nuclear site prior to the hearing process may well lead to greater likelihood that the pressure to "go nuclear" will be irresista-

ble. *See Gage v. AEC, supra,* 156 U.S.App.D.C. 231, 479 F.2d at 1217, 1219.

8. The Court agrees that an EIS prepared prematurely may be less than adequate by virtue of insufficient availability of hard information. *Scientists Institute for Public Information, Inc. v. AEC,* 156 U.S.App.D.C. 395, 481 F.2d 1079, 1093–94 (1973); *RICE v. GSA, supra,* 397 F.Supp. at 55, 60. However, the timing of EIS preparation is largely committed to agency discretion, *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), and the Court finds it difficult to conceive of a situation where premature preparation of an EIS, as opposed to the threatened use of a prematurely prepared EIS, would irreparably harm any plaintiff. Should the EIS which NRC will eventually prepare prove deficient, plaintiffs have a remedy in the NRC hearings, 10 CFR §§ 51.52, 51.5(a)(1), and thereafter in the Court of Appeals.

9. The Court is informed that the NRC has on numerous occasions docketed applications and commenced review prior to the acquisition by applicant of ownership or "control" over the contemplated site. E. g., Wisconsin Electric

one—whether or not the applicant can produce the information required by regulation and necessary for an effective hearing.[10] If it can—and there is no *a priori* reason why it cannot—ownership is irrelevant. Plaintiffs have no legal right to prevent NRC consideration of a project that may never happen.[11] Plaintiffs will have full opportunity to convince the NRC during the hearing, and the Court of Appeals thereafter, that the relevant regulations were not met. 10 CFR § 51.52; *Calvert Cliffs' Coordinating Committee v. AEC, supra.* Because there is no clear non-discretionary requirement that NEP own the NALF before NRC considers NEP's application, this Court has no jurisdiction to grant the requested relief.

■ Plaintiffs also claim that NRC has violated a clear, non-discretionary duty not to docket NEP's application until the required site and environmental documentation is complete. It is not disputed that the application was lacking certain environmental data which NRC requires prior to holding a hearing and issuing a license, as NRC has indicated by submitting a lengthy list of requests for information to NEP.[12] However, none of the statutes or formal

regulations binding the NRC is violated by its announced, long-standing practice of docketing incomplete applications. NRC regulations explicitly permit docketing an application prior to its completion of environmental data, 10 CFR § 2.101(a) (1976), and clearly contemplate that the applicant will be required to flesh out insufficient data in the Environmental Report subsequent to docketing, 10 CFR § 2.102(a), § 2.103(b) (1976). Although the regulatory guides of the NRC require an applicant to provide the NRC with more environmental data than NRP had submitted with its application, these regulatory guides do not have the force of law. *See Northern Indiana Public Service Co. v. Porter County Chapter of Izaak Walton League of America,* 423 U.S. 12, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975) (by implication) (per curiam), *rev'g* 515 F.2d 513 (7th Cir. 1975). Furthermore, the regulatory guides and the regulations have been interpreted by the NRC to grant it the discretion to proceed to docket deficient applications and then to require, by means of detailed requests for further information, additional data required by statute or regulation.[13] This interpretation is

Power Co. (Koshkonong), Dkt. No. STN 50–502; P. S. Co. of Indiana (Marble Hill 1 and 2), Dkt. Nos. STN 50–546, 50–547; TVA (Hartsville 1), Dkt. No. STN 50–518. The Court must accord substantial weight to NRC's interpretation of its regulations as permitting docketing and review of after-acquired sites. *Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League,* 423 U.S. 12, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975).

10. *See* 10 CFR §§ 51.20, 51.21.

11. Plaintiffs correctly assert that the construction of nuclear power plants at the NALF is "hypothetical" in the sense that such construction may never take place. Unless the NRC hearings are total sham, presumably all hearings deal with "hypothetical" projects in this sense, and properly so. This is not to say, however, that the NRC hearings will be grappling with a "hypothetical problem" rendering them mere meaningless probing in the air. The focus of the hearings must be on a specific site, but that site is no less specific because NEP does not yet (or may never) own it. At their strongest, plaintiffs are able only to characterize the hearing as "potentially meaningless". This case is therefore not covered by the "possibly over-generous" principle of *Pepsico, Inc.*

*v. FTC,* 472 F.2d 179, 187 (2d Cir. 1972) where Judge Friendly asserted that the district courts would have APA jurisdiction over an agency refusal to dismiss proceedings plainly beyond its jurisdiction or which could not possibly result in a valid order. *Id.*

12. Plaintiff has submitted, as exhibits to its Supplemental Memorandum in Opposition to Motion to Dismiss, copies of a series of intra-agency NRC documents. These documents reflect the advice of NRC officials that the NEP application should be docketed, subject to submission by NEP of additional information, required by regulatory guides and presently lacking. These documents were copied from a public record of NRC documents in the government documents room at the University of Rhode Island.

13. NRC has stated that it will not proceed to prepare an EIS until the necessary information is forthcoming. As counsel for NEP pointed out at the hearing, the present procedure of docketing at an early date an acceptably complete application promotes increased public knowledge of and participation in NRC proceedings. NRC documents noting deficiencies in the NEP application that will eventually be

634

entitled to great weight. *Id.* The Court cannot find that NRC has violated any clear, legal duty by proceeding first to docket NEP's application and thereafter to request additional information from NEP.[14]

■ The same reasoning applies to the alleged violation of NEPA, and again compels a finding that the Court lacks subject matter jurisdiction. Plaintiffs have not pointed to any clear statutory or regulatory requirement that the NRC delay its preparation of an EIS until NEP gains ownership of the NALF. In *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the Supreme Court found that agencies had great discretion in the timing of EIS preparation. *See supra* n. 8. Under *Kleppe,* it is apparent that there is no duty not to prepare an EIS at this time.

■ Nor do the factual allegations in plaintiffs' complaint amount to a violation of this Court's holding in *RICE v. GSA, supra.* In the first place, since neither defendant here was a party in the earlier case, neither can be bound by the outstanding injunction. More importantly, the *ratio decidendi* of that case was the proposition that GSA's duties under NEPA were independent of the AEC's. *Id.,* 397 F.Supp. 59–61. That reasoning applies here as well. The NRC has a legal duty to prepare an EIS in the course of its consideration of application for construction permits for nuclear plants. 10 CFR §§ 51.20–52.[15] *See Calvert Cliffs' Coordinating Committee, Inc. v. AEC, supra.* This Court in *RICE v. GSA* had neither power nor intention to

preclude NRC from complying with that duty. If GSA's EIS should prove deficient in plaintiffs' view by reason of insufficient attention to non-nuclear alternatives, plaintiffs have a remedy against GSA, which is not a party to this case. This Court has no authority to prevent NRC from conducting further environmental study.

■ Plaintiffs' last claim, asserting that permitting NRC to proceed will prevent plaintiffs "from having a fair hearing on state and local levels [and] prevents state and local regulatory agencies from legitimate and meaningful review and input into the decision by NRC", must be rejected as well. The town of Richmond, an intervenor-plaintiff here, has moved to intervene before the NRC, and will have opportunity to provide as much advice and comment in those hearings as it chooses. Of decisive significance, the regulation on which plaintiffs ground this claim does not constitute a "clear, nondiscretionary legal duty" whose violation is alleged by the factual allegations of the complaint. 10 CFR § 51.23 requires the NRC, in the hearings, to give

> due consideration . . . to compliance of the facility construction or operation and alternative construction and operation with environmental quality standards and requirements which have been imposed by Federal, State, regional and local agencies having responsibility for environmental protection, including applicable zoning and land use regulations . . .

the subject of the public hearing are a matter of public record, *see supra* n. 12, and interested parties therefore will have an informed opportunity to monitor subsequent attempts at filling in the gaps identified by NRC.

14. Plaintiffs also claim that NRC's actions violate the clear mandate of 42 U.S.C. § 2232(a) (1973), which provides in relevant part, "Each application for a license hereunder shall be in writing and shall specifically state such information as the Commission, by rule or regulation, may determine to be necessary . . .". However, this statutory section does not forbid the Commission from docketing an incomplete application, although it may well forbid issuance of a license until the application is complete. *See, e. g.,* 10 CFR § 2.104(b)(1)(i)(d).

Nor has the Court been directed to any formal regulations (as opposed to regulatory guides) which require, prior to docketing, specific information lacking in the NEP application.

15. At the hearing on these motions, the Court questioned whether it was necessary for both GSA and NRC independently to prepare, at enormous expense, environmental impact statements on the NALF which must inevitably result in substantial duplication of data collection and analysis. However, it appears that this case can be fully resolved without further exploration of this bureaucratic entanglement, which is better left for resolution (if any) by the Council on Environmental Quality.

Until the hearings are held, there is no way of knowing whether such due consideration has been afforded. The statute does not, as plaintiffs assert, require "approvals from the state and local governments". To the extent that other statutes or regulations require consideration or action by local authorities, the NRC obviously acts at its peril in preventing these authorities from making the necessary evaluations.

### III

■ I feel compelled to emphasize the limited nature of this dismissal, which is not meant in any way to place a stamp of approval on the conduct of NEP or GSA. This Court has previously found that GSA has violated federal law in attempting to transfer the NALF to a subsidiary of NEP without preparation of an EIS and in disregard of requests by other federal agencies for the land in question. *See RICE v. GSA*, 397 F.Supp. 41 and 411 F.Supp. at 326. NEP was no idle participant in those events. *See RICE v. GSA*, 397 F.Supp. at 48–51, 54–55, nn. 14, 18; *id.*, No. 74–272 (D.R.I. July 22, 1976) (order denying NEP and Narragansett Electric Company leave to intervene). The Court has also expressed deep concern that GSA seemed intent on creating an irretrievable commitment of the NALF to NEP and has noted that this could best be avoided by GSA's preparation of an EIS prior to any EIS which the AEC (NRC) might prepare. *See RICE v. GSA*, 397 F.Supp. 41; *id.*, No. 74–272 (D.R.I., August 24, 1976) (final order). It is therefore especially disturbing to note that GSA has announced its intention to await the NRC's EIS prior to issuing its own draft EIS.[16] Plaintiffs fear that the relief granted them in *RICE* will be rendered meaningless by this "end run"—that any chance that GSA will exercise independent judgment in finally determining to whom the NALF will be sold is further reduced by this procedure under which GSA's decision is dependent on analysis prepared by the NRC. Based on the record of these cases to date, this fear

that the fox is finally in the chicken coop is not groundless.

Disturbing as this train of events has been, under settled principles the Court is not empowered to grant the remedy that plaintiffs are now seeking, that is, to derail the NRC proceedings. But dismissal of the instant suit in no way forecloses other remedies that plaintiff may have against GSA in the *RICE* case, or against nuclear power in Rhode Island before the NRC or the Court of Appeals.

Complaint dismissed.

### ADDENDUM

After the Memorandum and Order in this case was filed on April 19, 1977, the Court received a letter from the Assistant General Counsel, Claims and Litigation Division, of GSA, which states in relevant part:

We received today from Assistant United States Attorney Sammartino a copy of your Memorandum and Order of April 19, 1977, in the subject litigation. At page 15 of that Memorandum the Court states:

"It is especially disturbing to note that GSA has announced its intention to await the NRC's EIS prior to issuing its own draft EIS.[16]" (Footnote in the original.)

In footnote 16 you refer to a memorandum dated November 13, 1976, prepared by a Mr. Cota of the Nuclear Regulatory Commission. A copy of that memorandum is attached for your convenience.

GSA is not a party to the subject litigation. Nevertheless, it would appear necessary to protest the quoted finding and to respectfully request the Court, in the interests of justice and due process, to revise its Memorandum and Order to excise in its entirety part III of its April 19 Memorandum and Order (copy attached). The reasons for this request are:

(1) It is not true that GSA now intends, or intended in November 1976, to

16. Memorandum, Phillip C. Cota, Project Manager, Environmental Projects Branch 1 to Voss A. Moore, Assistant Director for Environmental

Projects, Nov. 11, 1976, pl. ex. E attached to Plaintiff's Supplemental Memorandum in Opposition to Motion to Dismiss.

await the Nuclear Regulatory Commission's (NRC) environmental impact statement (EIS) prior to issuing its own draft EIS. In fact, GSA very soon will issue a solicitation for offers on a consultant's contract to assist GSA in preparing its EIS on the Charlestown Naval Auxiliary Landing Field (NALF). That contract will in no way link the timing of the delivery of the consultant's report with issuance of our EIS by the NRC.

(2) Even if Mr. Cota's characterization of what Mr. Gallagher "indicated" was accurate, as set forth in the attached memorandum (which we strongly dispute), Mr. Gallagher had no authority to determine GSA's position, policy or "intentions." The Cota memorandum, in short, is nothing more than hearsay evidence of a statement which, even if accurately recalled, was in no way an authorized statement of a GSA position.

(3) Not having been a party to the subject litigation, GSA has had no opportunity to rebut the inferences drawn by the Court from Mr. Cota's memorandum. Because of the potential impact of the above-quoted finding in the related litigation in *RICE v. GSA*, due process would seem to require that the above-quoted request be granted.

The Court believes that the Cota-Moore memorandum [1] speaks for itself, but publishes GSA's response, and current position, in the interest of fairness and completeness.

---

1. Cota's memorandum to Moore, *see* n. 16 of the Memorandum and Order, *supra*, stated in relevant part:

> On November 17, 1976, I called Mr. Peter Gallagher, Confidential Assistant to the Commissioner [of GSA], to get more details. He indicated that inquiries are being made with several government agencies concerning the possibility of obtaining funding from these agencies for GSA's environmental impact statement.

> Mr. Gallagher also indicated that GSA does not intend to publish their draft statement on disposal of the Charlestown site until six-to-eight weeks after our issuance of our draft statement on NEP 1 & 2. He feels that all available information regarding alternative uses of the site should be in GSA's hands before GSA issues its draft statement.